HENRY E. KRAEMER, APPELLANT, V. MENTAL HEALTH BOARD OF THE STATE OF NEBRASKA ET AL., APPELLEES.

261 N. W. 2d 626

Filed January 18, 1978.   No. 41284.

Richard Douglas McClain, for appellant.

Ronald D. Lahners, County Attorney of Lancaster County, and Roger W. Hirsch, for appellees.

Heard before WHITE, C. J., SPENCER, BOSLAUGH, McCOWN, CLINTON, BRODKEY, and WHITE, JJ.

PER CURIAM.

The questions to be decided on this appeal involve interpretation of and determination of the constitutionality of portions of the Nebraska Mental Health Commitment Act, Laws 1976, L. B. 806, p. 571, now sections 83-1001 to 83-1078, R. R. S. 1943. The appellant, Henry E. Kraemer, having been previously committed under the predecessor act which was found unconstitutional and its enforcement enjoined in Doremus v. Farrell, 407 F. Supp. 509, was given a rehearing before the State Board of Mental Health pursuant to the provisions of sections 83-1072 to 83-1076, R. R. S. 1943. It was determined by the board that he was a mentally ill dangerous person within the definition contained in section 83-1009 (1), R. R. S. 1943, and he was ordered committed under the provisions of section 83-1040 et seq., R. R. S. 1943. Treatment was ordered under the provisions of sections 83-1044 et seq., R. R. S. 1943. From that order

of the State Board of Mental Health, Kraemer appealed to the District Court for Lancaster County under the authority of section 83-1043, R. R. S. 1943. The District Court affirmed the order of the State Board of Mental Health.

Kraemer then perfected his appeal to this court and here assigns and argues the following errors which we paraphrase as follows: (1) The opinions of the State's expert witnesses that Kraemer was a mentally ill dangerous person and suffered from paranoid schizophrenia were incompetent because they were in part founded upon statements made by Kraemer in the course of interviews with state psychiatrists while in confinement and thus Kraemer's right not to incriminate himself was violated. The appellant more specifically contends the failure to give him Miranda-type warnings and to specifically notify him that he could remain silent and that anything that he might say could be used as a part of the evidence which might result in his confinement bars the use of such statements as part of the foundation for an opinion as to diagnosis. (2) The evidence before the board did not support a necessary finding that the appellant presented a substantial risk of serious harm to another and that risk was not "manifested by evidence of *recent* violent acts or threats of violence or by placing others in reasonable fear of such harm." (Emphasis supplied.) § 83-1009 (1), R. R. S. 1943. (3) The board erred in admitting the opinion of the expert witness because it was founded in part upon hearsay testimony. (4) A finding that Kraemer refused to cooperate in treatment was essential to the order of confinement and the evidence did not support such a finding. (5) The act is unconstitutional because it permits the State Board of Mental Health to base its findings upon "clear and convincing evidence" and does not require "proof beyond a reasonable doubt."

When previous statutes relating to confinement of

the mentally ill became impossible of enforcement because of the judgment of the three-judge Federal District Court in Doremus v. Farrell, *supra,* the Nebraska Legislature responded by enacting Laws 1976, L. B. 806. One of the problems that had to be dealt with was the status of those who were confined at the time of the Doremus holding. The act established a temporary State Board of Mental Health and required that rehearings before the board be held for such persons. It granted to those then in confinement all the procedural and substantive due process rights provided by the new act. Kraemer was one of those who was entitled to a rehearing. The rehearing was held and Kraemer was provided with counsel. Except as indicated by the errors assigned above, no complaint is made by him that the act was not in all respects complied with.

Insofar as pertinent to this case, section 83-1009, R. R. S. 1943, provides: "Mentally ill dangerous person shall mean any mentally ill person who presents: . . . (1) A substantial risk of serious harm to another person or persons within the near future, as manifested by evidence of recent violent acts or threats of violence or by placing others in reasonable fear of such harm . . . ." The substantive question for the board's determination, therefore, was whether Kraemer was a mentally ill dangerous person who presented one of the risks described in subsection (1) above.

The evidence before the board presented the following picture. In the fall of 1973 or the spring of 1974 Kraemer, who held a degree in architecture, was registered in a graduate seminar, conducted by Professor Puderbaugh, in the School of Architecture at the University of Nebraska at Lincoln. Puderbaugh's testimony was that Kraemer did not attend the classes as he should have, did not perform the work, and did not pass the course. In the early part of December 1974, Kraemer appeared at Puder-

baugh's office and demanded the professor's resignation because Puderbaugh "had not fulfilled [his] contract with the University." Kraemer was angry at the time and there was an exchange of words which the professor did not describe. The confrontation lasted about 30 minutes. Puderbaugh asked Kraemer to talk to the Dean of the School of Architecture. Kraemer refused. Puderbaugh got up and started toward the Dean's office. Kraemer followed, shouting. The noise made by Kraemer was so great the Dean interrupted the class he was teaching and came into the adjacent "gallery" to investigate. He found the professor with his back to the wall and Kraemer standing in front of him with his face 3 to 6 inches from that of Puderbaugh, "hollering." The Dean attempted to get Kraemer's attention, but could not get him to release his "fix." Finally the Dean, by use of force, pulled Kraemer away from Professor Puderbaugh and asked the latter to leave.

The Dean testified that Kraemer's "conversation" made no sense. His words and his manner seemed to threaten violence. The Dean escorted Kraemer to the exit, informed him that he was Dean of the school, and that he was the person that Kraemer should talk to. Kraemer rejected recognition, saying, among other things, "You're not the Steward (the Dean's surname) that I knew." The Dean asked Kraemer to leave. Kraemer stood there for a few minutes without conversation and then left.

The Dean then caused to be circulated in the architectural school a memorandum to all personnel directing that if Kraemer was thereafter present in the building the Dean was to be immediately notified.

About 2 weeks after the above incident Kraemer again came to Puderbaugh's office. A similar confrontation with similar charges made by Kraemer took place. On this occasion the University police

were called. An officer responded. He observed the argument for a few minutes and then called for another officer. Pending the second officer's arrival, he returned to Puderbaugh's office and again observed. The officer stated that Kraemer said that Puderbaugh would come around to his way of thinking "or else." Kraemer would not leave when requested to do so by Puderbaugh. The officer asked Kraemer to leave. Kraemer challenged the officer's authority. Kraemer then sat silently and stared at the professor as if he "were staring right through" him. The second officer arrived and the first officer then convinced Kraemer that he should leave and told him that complaints should be directed to the Dean. As the officers and Kraemer started down the steps with the first officer leading the way, a scuffle ensued between Kraemer and the second officer. When they reached the floor below Kraemer became violent. He was then handcuffed and placed under arrest, jailed, and charges were filed. The first officer appeared in court the following morning at Kraemer's arraignment. Kraemer "stared" at him and finally accused him of being part of a conspiracy. He requested the officer's name and badge number, which the officer furnished and which Kraemer recorded. At the arraignment Kraemer challenged the authority of the judge. After arraignment, during the course of the signing of an appearance bond, Kraemer noticed a misspelling and ran from the clerk's office to the rear of the judge's bench where the judge was seated, creating a noisy disturbance. Kraemer had to be forcefully removed. Later he had to be forcibly removed from the county attorney's office.

Kraemer was committed by the county board of mental health to the Lincoln Regional Center on December 13, 1974. He "escaped" 2 days after his commitment and was returned again the following day. He "escaped" again on December 26, 1974,

and while on the second escape, he was administratively "discharged" on January 3, 1975, without being returned.

While Kraemer was on "escape" in December of 1974, the University police officer, whose name and badge had been taken by Kraemer, received a call from his wife that a man was at the door of their residence acting strangely. The officer reported the matter to the Lincoln police department and Kraemer was picked up about 20 minutes later a few blocks from the officer's home.

In about the third week of May 1975 (fixed by one witness as either May 18th or May 23rd), Kraemer again appeared at Puderbaugh's office. He was carrying a rifle. He walked past the secretary's desk to the door of Puderbaugh's personal office. He was calm. He carried the rifle level or pointed down. Upon reaching the door he turned to the secretary and asked if Puderbaugh was there. She informed him that he was out of town and that he would be back at the end of the week. Kraemer responded, "All right, I'll be back later," and promptly left. Puderbaugh was informed by telephone of this incident and he immediately called the Lincoln police department from Atlanta, Georgia, where he then was, and asked the police department to guard his home in Lincoln, and that of his son and daughter who also lived in Lincoln.

As a consequence of the above incident members of the Nebraska State Patrol were informed that a warrant had been issued for Kraemer out of Lancaster County. Officers of the patrol made a search for Kraemer in Omaha and did not find him. He was located by them in a nearby Nebraska town where he had an apartment. Two officers, not in uniform, rapped on the door of Kraemer's apartment. Kraemer responded, opening the door about 18 inches. They identified themselves as officers and one of the officers exhibited his badge to

Kraemer. They informed him of the warrant. Kraemer questioned their authority, attempted to close the door, and then retreated into the apartment. The officers followed, reaching him as he was reaching into a closet. They placed him under arrest at that time. Later they obtained a search warrant, returned to the apartment, and found in the closet a loaded 30/30 Winchester rifle and a box of shells. The rifle was identified as the one carried by Kraemer on his last visit to Puderbaugh's office. The rifle and shells were received into evidence without objection. The evidence indicated the rifle had been purchased by Kraemer on May 15, 1975, which was a few days before his visit (with gun in hand) to Puderbaugh's office. Kraemer was committed to the Lincoln Regional Center by the county board of mental health on May 22, 1975, and it was with reference to that confinement that the rehearing was granted under the provisions of sections 83-1072 to 83-1076, R. R. S. 1943. The rehearing was held on June 22, 1976, and August 2, 1976, and it was at that hearing the foregoing evidence was adduced.

Additional evidence in the form of expert testimony was also offered and in part received.

The first such expert witness called was L. E. Woytassek, M. D., a psychiatrist employed at the Lincoln Regional Center. He was present when Kraemer was admitted to the security unit of the center on May 22, 1975. At that time he took a history of the patient and did a mental status examination of the patient. Dr. Woytassek testified from a report that he had made on that occasion.

Kraemer's counsel made objection to some of this testimony because it contained statements made by Kraemer in the psychiatric interview. The basis of the objection was that there was no showing that Kraemer had been warned that he might remain silent, or that he knowingly and voluntarily waived his right to remain silent. The board, through its

chairman, ruled that Miranda-type warnings needed to be given to the patient and refused to permit the witness to testify as to statements made by Kraemer in the psychiatric interview. The witness was permitted to testify from the balance of the report and to give his diagnosis.

The doctor's opinion was as indicated by the following responses to questions put:   '' 'The patient exhibits all the classic symptoms of a schizophrenic illness.   The disorganized thinking, the marked delusional system, the inappropriate effect, as well as circumstantiality, all point towards a psychotic illness.   There is very little evidence of neurosis.   And there is no evidence of an organic brain syndrome.' . . . A psychotic (sic) is a major mental illness in which the patient exhibits the things which I have referred to, the disorganized thinking, the delusional system, inappropriate effect, et cetera. . . . Schizophrenia, Paranoid Type.''   The witness further stated the patient had no insight into his illness and did not recognize that anything was wrong.   The doctor also recommended a treatment plan which included confinement in the security unit and medication.

A second psychiatrist, Edwin A. Coats, M. D., also employed by the Lincoln Regional Center, testified. He had contact with Kraemer only after his admission to the center in May of 1975.   He described the medication being given as part of the treatment. The purpose of the medication was to reduce psychotic thinking, agitation, and tension on the part of the patient.   He was present at the recommitment hearing and heard the testimony there presented. He diagnosed Kraemer's illness as paranoid schizophrenia and expressed the expert opinion that the patient was then a dangerous individual; that he was dangerous to Professor Puderbaugh and to those persons who had testified adversely to him; and that his animosity toward Puderbaugh still remained and

was part of the psychosis. He furter stated that
Kraemer had not been violent since his confinement
on May 22, 1975, but on occasion had refused medica-
tion and was at times agitated, restless, hostile, and
angry. Upon objection, the witness was not per-
mitted to relate anything that he had been told by
Kraemer. There were no objections to the balance
of the witness' testimony. The witness predicted
slow progress for the patient and long hospitaliza-
tion. Kraemer's mental status is periodically re-
viewed during his confinement.

Kraemer applied for a rehearing before the State
Board of Mental Health pursuant to the applicable
section of the statute. Rehearing was denied. The
appeal from that denial raises no issues different
from those contained in the assignments of error.

At the hearing Kraemer did not take the stand to
testify on his own behalf. He did not offer any medi-
cal testimony to contradict that of the State's doc-
tors although he was entitled to such expert assist-
ance at state expense if indigent. § 83-1052, R. R. S.
1943. Whether or not he availed himself of his statu-
tory rights under the act to consult medical experts
is not shown by the record.

We now consider the assigned errors. The claim
that the statements made by the patient during a
psychiatric interview violated the Fifth and Four-
teenth Amendment right not to incriminate oneself
is bottomed on the provisions of section 83-1059, R.
R. S. 1943. That section provides: "The rules of
evidence applicable in civil proceedings shall be fol-
lowed at all preliminary, final, and other judicial
hearings held under this act. In no event shall evi-
dence be considered which is inadmissible in crimi-
nal proceedings." The plaintiff's argument seems
to be that the last sentence in the statute in some
way incorporates every exclusionary rule which
might be applicable in any criminal proceeding and

that in this case it embodies the giving of Miranda-type warnings to assure evidence of voluntariness.

The last sentence of that statute is on its face an apparently simple declarative sentence. It seemingly ought to offer no interpretational problems. However, when one begins to think about how it can be applied to proceedings involving determination of mental health issues, it immediately becomes apparent that its application is ambiguous and, depending upon its meaning, may conflict with the first sentence.

The first thought that comes to mind, of course, is that several things influence what evidence is admissible in a criminal proceeding. The first is the nature of the crime involved. The substantive evidence must be material and relevant to the proof of the elements of the crime charged. The second is that the evidence must be competent under the rules regarding admissibility. The third consideration concerns pertinent constitutional requirements arising under due process or other constitutional provisions, an example of which, of course, would be the voluntariness of a confession or admission of guilt.

Kraemer was not in this case charged with the commission of a crime. Any confinement which might be the result of the hearing was not punishment for a crime committed. The Fifth Amendment to the Constitution of the United States, among other things, provides: "No person shall be held to answer for a . . . crime . . .; nor shall be compelled in any criminal case to be witness against himself, nor be deprived of life, liberty, or property, without due process of law . . . ." The constitutional right not to be a witness against oneself applies only to admissions which might be used against the witness in some criminal prosecution. The Miranda rule applies to custodial interrogations by law enforcement officers of persons suspected of or charged

with crime. Miranda v. Arizona, 384 U. S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694.

Let us now return to the statutory provision. Section 83-1059, R. R. S. 1943, makes the provisions of Chapter 27, R. R. S. 1943, which codify the general rules of evidence, applicable to proceedings under the act insofar as they may be pertinent. They apply both in the preliminary and final hearings before the board of mental health and in any judicial hearings. In mental health proceedings, medical diagnosis is involved and is, of course, material. This is also true in criminal proceedings in some cases, such as those where the defense of insanity is raised. In the latter case the burden of proving the sanity of the accused is on the State. See NJI No. 14.30 and cases there cited. In the case before us the burden of proof is upon the State to prove that Kraemer was and is a mentally ill dangerous person within the statutory definition. In this case Kraemer was not charged with a crime, or even suspected of a crime. He was not being interrogated by a law enforcement officer, but by a doctor and the purpose was to determine, by medical diagnosis, his mental status. Treatment or incarceration or both could result from that determination. The evidence in question would be admissible under the applicable statutory rules where, as here, the issue of the party's mental status or sanity is the issue. The opinion of the medical expert was admissible unless barred by some statutory rule or constitutional requirement.

Section 27-703, R. R. S. 1943, provides: "The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to him at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence." The solidity of the facts on which the expert relies for his opinion may

be determined in cross-examination of the expert. § 27-705, R. R. S. 1943. It is apparent that a conflict may exist between the first and last sentences of section 83-1059, R. R. S. 1943, when one attempts to apply them to particular sets of facts and that such a conflict does exist in this case. It is claimed that the last sentence embodies every possible exclusionary rule..

We feel constrained to construe the statutes so that they make some reasonable sense. Let us examine some of the problems which would arise if examining and treating psychiatrists were not permitted to testify as to the basis of their opinions. Persons who are the subject of possible commitment under the act are granted many rights, including those enumerated by sections 83-1046 to 83-1064, R. R. S. 1943. Section 83-1046, R. R. S. 1943, grants the right to immediate discharge when need for confinement no longer exists. Under the provisions of section 83-1066 (9), R. R. S. 1943, the person has the right to a writ of habeas corpus for purposes of challenging the legality of confinement and treatment. It would be anomalous if the treating psychiatrists were not permitted to testify in such proceedings. This could be the consequence if Miranda-type warnings were a condition precedent to every conversation between the psychiatrist and the patient. Under subsection (3) of section 83-1066, R. R. S. 1943, the confined patient has, with exceptions, the right to refuse treatment. Adverse effects both to the patient and to the State could result if the facts with reference thereto could not be shown because the Miranda warnings were not given each time the doctor converses with his patient.

Kraemer recites and relies upon Lessard v. Schmidt, 349 F. Supp. 1078, vacated 414 U. S. 473, affirmed on rehearing 379 F. Supp. 1376. In that case the three-judge Federal District Court, after discussing In re Gault, 387 U. S. 1, 87 S. Ct. 1428, 18 L. Ed.

2d 527, which, as is well known, related to juvenile proceedings, pointed out that the privilege against self-incrimination applies irrespective of the type of proceeding at which the witness is testifying. The court then discussed self-incrimination and mental illness commitment cases, saying: "On the other hand, the prospect of a seriously ill individual being prevented from obtaining needed treatment, in a situation in which treatment is possible and will actually be given, on the basis of counsel's advice to refuse to make any statements to a psychiatrist appears ludicrous. As the majority stated in Tippett v. Maryland, 436 F. 2d 1153, 1158 (4th Cir. 1971), cert. dismissed sub nom., Murel v. Baltimore City Criminal Court, 407 U. S. 355, 92 S. Ct. 2091, 32 L. Ed. 2d 791 (1972), '[i]t is difficult to imagine anything more stultifying to a psychiatrist, as dependent as he is upon the cooperation of his patient, than the presence of a lawyer objecting to the psychiatrist's questions and advising his client not to answer this question and that.' . . . The conflicting interests are thus difficult to reconcile." In Lessard the court nonetheless adopted the view of Mr. Justice Douglas advanced in a concurring opinion in McNeil v. Director, Patuxent Institution, 407 U. S. 245, 92 S. Ct. 2083, 32 L. Ed. 2d 719, to the effect that the Fifth Amendment applies to examinations by a psychiatrist and that such interrogation must be preceded by a warning. In Doremus v. Farrell, *supra,* the court seems to have adopted the view of Lessard, but it is not clear from the opinion whether its expression was dicta or holding. The court listed eight specific reasons for holding the predecessor statute to the present act unconstitutional. Those eight items do not specifically include the failure to give warnings of the right not to "incriminate" oneself in the course of a psychiatric interview.

In any event, the United States Supreme Court has not spoken on the point and we prefer to follow our

statute as we construe it and we do not accept the view of the two Federal District Courts on this particular point.

As we have already noted, the board struck from the report and did not permit the psychiatrist to testify as to his conversation with Kraemer and did not permit Kraemer's statements to him to come into evidence. Nonetheless it is clear enough that the diagnosis was in part based upon the conversations with Kraemer and that if the view of Lessard is to be followed, the doctor's opinion in this case was probably inadmissible.

Section 83-1059, R. R. S. 1943, which prescribes the rules of evidence applicable to preliminary and final hearings and judicial hearings under the Nebraska Mental Health Commitment Act does not mandate that Miranda-type warnings precede a psychiatric interview of the person claimed to be a mentally ill dangerous person as defined by section 83-1009, R. R. S. 1943. We prefer to follow the views expressed in the following cases: In re Beverly (Fla.), 342 S. 2d 481; State v. O'Neill, 274 Ore. 59, 545 P. 2d 97. These cases, however, did not involve statutory provisions such as section 83-1059, R. R. S. 1943. These cases point out that constitutional protection against self-incrimination does apply if the psychiatric interview should be offered in a criminal trial. We do not wish to say, however, that the second sentence of section 83-1059, R. R. S. 1943, is totally without meaning. Offhand, it would seem that it might clearly have the effect contended for if physical evidence seized in an illegal search were offered at the hearing before the board.

The essence of Kraemer's second assignment is that the record shows no *recent* violent act, or threat of violence, or the placing of a person in reasonable fear of harm. We have earlier reviewed the evidence. We hold that the incident of May 1975 was sufficiently recent to conform to the meaning of the

statute. Any other view would require, as to those already committed when the enforcement of the former act was enjoined and who were entitled to a new hearing under section 83-1072, R. R. S. 1943, the discontinuance of treatment and release in order to afford an opportunity for a more recent act of violence before any rehearing and further confinement could take place. Such would be contrary to the evident and expressed purposes of section 83-1072, R. R. S. 1943, when read in conjunction with the entire act.

We hold that a mentally ill person, who was confined at the time the predecessor statute to Laws 1976, L. B. 806, was declared unconstitutional and who became entitled to a hearing under' the provisions of section 83-1072, R. R. S. 1943, may be determined to be a mentally ill dangerous person if, at the time of hearing under section 83-1072, R. R. S. 1943, he still presents the risk described in section 83-1009, R. R. S. 1943, and if his confinement was the consequence of a proven violent act or threat of violence or placing others in fear of such harm.

The third assignment contends that the opinion of the psychiatrist was inadmissible because in part founded upon "hearsay" testimony. The record supports the conclusion that this is true. However, the provisions of the Code of Evidence, which we have already discussed and which were adopted by this act, permit it. The assignment is not meritorious.

As to the fourth assignment and the finding of non-cooperation in treatment, our reading of the act fails to disclose that the statute requires such a finding. Accordingly that assignment requires no further consideration.

We also find that the fifth assignment, which asserts that the act is unconstitutional because it does not require "proof beyond a reasonable doubt," is not meritorious. That contention is founded upon the holding in Lessard v. Schmidt, *supra*. In

Doremus v. Farrell, *supra,* the court held that "clear and convincing proof" is sufficient. For a purely pragmatic reason, if no other, we follow Doremus. Presumably if a three-judge Federal District Court for Nebraska is called upon to review the present act, the composition of the court is likely to be the same, at least in part, and so it is probable that the same standard would be adhered to. The evidence we have previously set forth was sufficient for the board to make its findings by the standard prescribed by the statute.

AFFIRMED.