IN RE INTEREST OF LAWRENCE G. LUX, ALLEGED TO BE A MENTALLY ILL DANGEROUS PERSON. LAWRENCE G. LUX, APPELLANT, V. THE MENTAL HEALTH BOARD OF POLK COUNTY, NEBRASKA, ET AL., APPELLEES.

274 N. W. 2d 141

Filed January 17, 1979. No. 41744.

Alan G. Gless of Mills & Mills, for appellant.

Philip H. Nyberg and Ronald E. Colling, for appellees.

Heard before SPENCER, C. J., Pro Tem., BOSLAUGH, McCOWN, CLINTON, BRODKEY, and WHITE, JJ., and KUNS, Retired District Judge.

PER CURIAM.

This is an appeal under the provisions of section 83-1043, R. R. S. 1943, from an order of the District Court for Polk County, affirming the county mental health board's order finding that the appellant, Lawrence G. Lux, was a mentally ill dangerous person as defined by section 83-1009, R. R. S. 1943, and committing him to the Lincoln Regional Center for treatment under the provisions of sections 83-1037 and 83-1041, R. R. S. 1943.

Upon appeal to this court the following errors are assigned: (1) The District Court erred in not reviewing the findings of the mental health board de novo as provided by section 83-1043, R. R. S. 1943. (2) The board erred in admitting and the District

Court erred in considering the opinion of a certain physician that Lux was a mentally ill dangerous person. (3) The evidence is insufficient to support a finding that Lux was a dangerous person because the record contains evidence of only one assault upon a person.

Section 83-1043, R. R. S. 1943, provides for appeals of final orders of the mental health board and states: "Such appeals shall be de novo on the record." The District Court, in its order of affirmance, recited that the function of the mental health board "is a legislative one delegated to it," and consequently the court's review was limited to determining whether the order was supported by substantial evidence, whether the board acted within the scope of its authority, and whether its action was arbitrary, capricious, or unreasonable. The District Court apparently assumed that, because the function of the board is prescribed and regulated by statute, the board was exercising a legislative function, and that the appropriate standard of review was therefore the limited one enunciated in recent cases such as Haller v. State ex rel. State Real Estate Commission, 198 Neb. 437, 253 N. W. 2d 280, Herink v. State ex rel. State Real Estate Commission, 198 Neb. 241, 252 N. W. 2d 172; American Assn. of University Professors v. Board of Regents, 198 Neb. 243, 253 N. W. 2d 1; and Scott v. State ex rel. Board of Nursing, 196 Neb. 681, 244 N. W. 2d 683.

Those cases do hold that if a court is reviewing an exercise of authority which is in its nature legislative, then the Legislature may not prescribe a de novo standard of review, because that would constitute a violation of the constitutional requirement of separation of powers. Art. II, § 1, Nebraska Constitution; Keller v. Potomac Elec. Co., 261 U. S. 428, 43 S. Ct. 445, 67 L. Ed. 731. However, the District Court erred in assuming that merely because the board's function is prescribed by statute the board was there-

fore exercising a legislative function. None of the above-cited cases so held. It is the nature of the function, not merely its statutory origin, which determines whether a governmental function is legislative or judicial. For example, the Legislature has the authority under the Nebraska Constitution to create certain courts. Art. V, § 1, Nebraska Constitution. It would not follow from that, however, that a new court created by statute is exercising legislative authority.

We have not heretofore attempted to define precisely the line between the judicial function and power and the legislative one. Probably we cannot do so. See Prendergast v. Nelson, 199 Neb. 97, 256 N. W. 2d 657 (concurring opinion of Clinton, J.). We must necessarily proceed upon a case-by-case basis. Utility ratemaking, for example, is a legislative function and subject only to limited judicial review. Keller v. Potomac Elec. Co., *supra*. The licensing and regulation of the professions dealing with health is a legislative function, and there is a similar limitation upon judicial review. Scott v. State ex rel. Board of Nursing, *supra*. The initial determination of terms and conditions of employment is also a legislative function, Orleans Education Assn. v. School Dist. of Orleans, 193 Neb. 675, 229 N. W. 2d 172, as is the regulation and licensing of businesses. Haller v. State ex rel. State Real Estate Commission, *supra*; Herink v. State ex rel. State Real Estate Commission, *supra*. See, also, 16 C. J. S., Constitutional Law, § 107, p. 493. On the other hand, the determination of whether a party's statutory rights have been violated is clearly a judicial function and a legislature mandate requiring de novo review is proper. Snygg v. City of Scottsbluff Police Dept., 201 Neb. 16, 266 N. W. 2d 76.

One method of determining whether a function is legislative or judicial is to examine its origins. Lunacy proceedings, as they were formerly called,

had their English origin in the executive power of the crown as parens patriae. The determination of lunacy was made by a commission which was under the supervision of the chancery courts. Hamilton v. Traber, 78 Md. 26, 27 A. 229; Bliss v. Bliss, 133 Md. 61, 104 A. 467. A similar pattern has apparently been followed in the United States, although the manner of proceedings in such matters is subject to regulation by statute. See, generally, 44 C. J. S., Insane Persons, §§ 14 et seq., p. 68. In accord with that historical practice, the members of the mental health boards in Nebraska are appointed by the presiding District Judge. § 83-1018, R. R. S. 1943. Appointment of similar boards under prior statutes was also entrusted to the District Judge.

Furthermore, Nebraska courts have long been permitted to make independent determinations of mental incompetency for the purposes of protecting the person and the property of the incompetent. Hall v. Hall, 122 Neb. 228, 239 N. W. 825; 44 C. J. S., Insane Persons, § 8, p. 54. Commitment proceedings are clearly judicial, and a court must therefore review the determination of a mental health board de novo on the record as the statute requires. Thus, the District Court erred in not following the statutory requirement to look at the evidence de novo.

However, we have concluded the court's error does not require reversal. We have carefully examined the evidence, and, whatever standard of review might be applied, the court could not reasonably have found other than as it did. A mistake by the court as to the extent of its authority is not reversible error if the court nonetheless reached the right result. Where a correct judgment or order has been made, the mere fact that it contains erroneous declarations of law does not require reversal. State v. Alexander, 78 Wyo. 324, 324 P. 2d 831. This principle is analogous to our frequently stated rule that no judgment will be reversed merely because the

court has given a wrong reason for it. Schmitt v. City of Omaha, 191 Neb. 608, 217 N. W. 2d 86.

The hearing before the mental health board commenced on February 16, 1977, and after considerable evidence had been produced by the State, the hearing was, at Lux' insistence, continued to February 23, 1977, at which time it was concluded. Lux was represented throughout the proceedings by counsel, although at his own insistence he was permitted to examine witnesses and in the course thereof to make rather extended unsworn statements.

Section 83-1009, R. R. S. 1943, defines a mentally ill dangerous person as "any mentally ill person who presents: (1) A substantial risk of serious harm to another person or persons within the near future, as manifested by evidence of recent violent acts or threats of violence or by placing others in reasonable fear of such harm." The board found Lux to be a mentally ill person who was dangerous in that he had committed an unprovoked assault upon his father. The board also determined that neither voluntary hospitalization nor other treatment alternatives less restrictive of the subject's liberty were available to prevent further harm, and committed Lux to the Lincoln Regional Center at Lincoln, Nebraska, on March 4, 1977.

Two psychiatrists, who had at various times examined Lux, testified concerning his mental condition, as did one general practitioner of medicine who was acquainted with Lux and had observed him. Both psychiatrists were called by Lux as his witnesses. One of the psychiatrists diagnosed Lux as in a paranoid state while the other simply described him as having paranoid reactions and was unwilling to label him as a schizophrenic because such labels seriously affect possibilities of future employment. The above diagnoses are uncontradicted by any testimony or evidence other than Lux' implicit denials and his insistence his thinking was not delusional

because his claims of persecution were founded upon fact.

Lux asserted in a question that his paranoid state "was caused by persecutional pressures exhibited by my environment," to which statement one psychiatrist responded, "But this is assuming that people are doing these things to you Larry." One of the psychiatrists testified that, despite the fact that Lux' parents were in Nebraska, Lux believed the influence of his parents on other persons was such that people whom Lux sought to engage in conversation while he was in Florida would walk away from him. The psychiatrist, under Lux' cross-examination, acknowledged that he had made no attempt to verify the above "fact." Lux also at times heard voices speaking to him when no one was present. Lux told one of the psychiatrists that "he would deal with injurious individuals as he deemed appropriate and on one occasion stated that this may include homicide." He did not care whether or not he might be imprisoned. The psychiatrist's ultimate diagnosis was "Paranoid State," including "assaultive and homicidal ideation."

The incident which precipitated the current proceedings occurred at the home of Lux' parents on November 23, 1976. At that time Lux made an unprovoked attack upon his father and attempted to strangle him while his father was sitting in a recliner watching television. Both Mr. and Mrs. Lux testified to the incident. His mother attempted to stop the assault by picking up a heavy cane and hitting Lux repeatedly, but he did not stop. Finally she exclaimed, "My God Larry, you're killing your dad." At that time he stopped and helped pick his father up off the floor.

The attack upon the elder Mr. Lux was apparently motivated by Lux' belief his father would not tell him the truth "about any theft and development of mechanical systems whose theory I was working

on." The parents knew nothing about matters concerning which Lux sought information. The fact Lux assaulted his father in the manner described is not denied; nor was the attack defended in the record other than by Lux' stated beliefs of his reason for the attack which was to choke the truth out of his father.

Mrs. Lux further testified that on previous occasions Lux had, without apparent provocation, deliberately damaged furniture in the Lux home to the extent it could not be repaired. He had told his parents he was going to do harm to other people and once left the home with a shotgun for that apparent purpose but later returned without having done anything. Mr. Lux testified he was frightened of Larry. Mrs. Lux stated she was not frightened for herself, but was frightened for her husband and for Larry.

We have not recited all the evidence of delusional thinking by Lux. We point out merely that the diagnoses and evidence of the assault and the threats are not contradicted.

Lux had either been committed or held on five previous occasions for treatment or diagnosis of mental illness. The evidence indicated that when Lux was treated as an outpatient he would not on some occasions take the prescribed medication and for that reason the doctor sometimes did not give a prescription. Lux believed the medication was in part responsible for his delusions and, at the continued hearing on February 23, 1977, indicated that during the prior part of the hearing he had not been able to "defend" himself because someone had been putting hallucinogenic drugs in his food. The conclusion of the board that confinement was necessary to treatment could hardly have been otherwise.

Dr. Clarence Davis, Jr., M. D., a general practitioner since 1957, testified for the State. Dr. Davis had visited Lux in the county jail a couple of weeks before the hearing, was acquainted with the history

of Lux' past commitments, and had seen him professionally. The doctor was made aware of the unprovoked assault by Lux on his father. On the same day the assault occurred, Dr. Davis was advised by a member of the sheriff's department that Lux' mother had informed the sheriff's office Lux was on his way to the doctor's office and she feared he might harm the doctor. The doctor then locked the doors of the office. Lux did arrive and could not get in. He returned to the office twice more, attempting to enter. One of the receptionists who observed Lux said he seemed disturbed.

The doctor testified that in his opinion Lux was, at the time of hearing, a paranoid schizophrenic and a dangerous person. He stated: "My observations of his condition has indicated a progressive progression of his illness and a progression of his danger — of potential danger to himself and to the community," and that he could not be helped much as an outpatient. The foundational evidence indicated Dr. Davis had the usual amount of psychiatric training given to medical students, that is, 1 month of clinical experience as well as textbook study. He could and did define paranoid schizophrenia.

Lux contends that "the foundation presented for Dr. Davis' testimony was insufficient to qualify him as an expert and failed to show his opinion was founded upon proper bases." He argues that the requirements of section 27-703, R. R. S. 1943, have not been met. That statute provides: "The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to him at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence." Lux' specific contention seems to be that the information Dr. Davis relied upon was not "of a type reasonably relied

upon by experts in the particular field in forming opinions" because Davis administered no psychiatric or psychological tests and because the types and sources of information on which the doctor relied were not disclosed and that that is what section 27-703, R. R. S. 1943, requires. Lux, in his brief, discusses a number of opinions of this court, all antedating section 27-703, R. R. S. 1943, which he claims support his position.

His position is not well founded. It is clear the doctor's professional qualifications were sufficient. It is further clear enough that his opinion was based upon his observation of Lux as well as on what he was told. The testimony of the two psychiatrists disclosed that clinical observation of the patient, that is, talking to him and observing him, are prime factors in the formation of expert opinion. Dr. Davis' testimony was properly admitted. We note in passing that the Nebraska Mental Health Commitment Act includes in its definition of mental health professional, "a practicing physician licensed to practice medicine in this state under the provisions of section 71-102." § 83-1010, R. R. S. 1943.

The contention of Lux that the evidence is insufficient because the evidence shows only one violent act against a person is also without merit. It is true that section 83-1009(1), R. R. S. 1943, refers to "recent violent acts." However, to read the statute as requiring evidence of more than one violent act or threat would be ridiculous. It obviously contemplates the admission of evidence of as many recent violent acts or threats as there may be. We have implied as much in Kraemer v. Mental Health Board of the State of Nebraska, 199 Neb. 784, 261 N. W. 2d 626. We further point out that section 49-802, R. R. S. 1943, which sets forth the general rules of construction which the Legislature wishes applied to the statutes which it enacts, includes the following: "(6) Singular words may extend and be applied to

several persons or things as well as to one person or thing. (7) Plural words may extend and be applied to one person or thing as well as to several persons or things."

AFFIRMED.