**In the Interest of Laura GOODWIN, Respondent and Appellant.**

**Civ. No. 10922.**

Supreme Court of North Dakota.

April 30, 1985.

Daniel E. Buchanan, Sp. Asst. Atty. Gen., Jamestown, for petitioners and appellees.

Hjellum, Weiss, Nerison, Jukkala, Wright and Paulson, Jamestown, for respondent and appellant; argued by Terence J. Paulson, Jamestown.

MESCHKE, Justice.

Laura Goodwin appeals an Order of the Stutsman County Court, determining that she is mentally ill and that she requires continuing hospitalization and treatment at the North Dakota State Hospital at Jamestown, North Dakota "for an indefinite period or until further Order of the Court." She contends that the Order was constitutionally erroneous since it was based upon her own testimony, compelled over her objection. We need not decide that question. We reverse and remand for a new hearing on other grounds.

Mrs. Goodwin, age 69, was first committed to the State Hospital for a 90 day period by the Stutsman County Court on October 31, 1984. On January 14, 1985, before the statutory expiration of this Order, the State Hospital filed a Petition for Continuing Treatment pursuant to Sections 25–03.1–21 and 25–03.1–23, N.D.C.C., alleging that she "continues to be mentally ill,"

that she "requires further treatment," and that "treatment other than hospitalization is not in [her] best interest." Incorporated by reference was a "Report of a Physician" (not a psychiatrist or clinical psychologist) evaluating her "physical and mental condition" as follows:

"Patient is demented. Has exhibited loss of intellectual abilities that interferes with social or occupational functioning. Memory impairment. Impaired judgment and insight."

The report of the physician on a printed form concluded that she was "an individual with an <u>organic, mental</u> ... disorder which substantially impairs the capacity to use self-control, judgment and discretion in the conduct of personal affairs and social relations, and is therefore <u>a mentally ill person</u>." (Underlining in original.) The report also concluded that there was a "serious risk of harm" to herself and "a substantial likelihood of ... suicide as manifested by suicidal threats" and of "substantial deterioration in physical health ... resulting from poor self-control or judgment in providing for one's shelter, nutrition or personal care." The physician stated that she was "in need of hospitalization for the following reasons":

"She remains confused and disoriented. Patient has a tendency to wander, leaving the house without knowledge of husband. Recent memory is poor but memory from past events is fairly good. Aware of surroundsing [sic] but disoriented to time and date. She thinks that the year is 1972 and she is 52 years old."

At the hearing before the Stutsman County Court on January 23, 1985, there were only two witnesses: Dr. Chiu, a medical doctor,[1] and Laura Goodwin.

Dr. Chiu haltingly described her condition:

"... deviate ideas and psychiatric behavior ..."

"... when she was admitted to the hospital, before that, ... she wandered away and then laid on the railroad track and said that no one loved her and no one cared about her and that she wanted to kill herself. * * * That's from the record."

"... she still has the ideas that no one cares about her and so no one love her...."

"She knows she in the State Hospital, but she doesn't remember even her room."

He diagnosed her condition as "dementia,"[2] a "so called defect of affection and the present time I think her mental state is more and more deteriorating, confusion ... disorientation more obvious." He characterized her dementia as "mild, mild to moderate" which impaired her capacity to use self-control and judgment "moderate to markedly."

Dr. Chiu described her treatment as only medication, Haldol, "a psychotropic medication, in essence to control her deviate ideations and psychiatric behavior," and another medicine to control its side effects. Her treatment plan was to "be continuously receiving these psychotropic medications and nursing supervising."

When asked if that couldn't just as well be provided in an out-patient setting, Dr. Chiu stated:

"Outpatient, she has no place to go, and medical team and Social Services doesn't believe she should be home because she has had trouble with her husband and both of them was an alcoholic."

On cross-examination, Dr. Chiu testified: "Q: Dr. Chiu, isn't it true that one of the other doctors wrote in the chart that he felt that the Hospital should seek alternative treatment for Laura at a nursing home. Wasn't that a recommendation?

1. The initial part of the tape recording of the hearing proceedings is missing due to a malfunction of the recording device. The missing portion evidently contained Dr. Chiu's credentials. We were advised upon oral argument that he was a physician but not a psychiatrist or clinical psychologist.

2. "Dementia" is "a condition of deteriorated mentality that is characterized by marked decline from the individual's former intellectual level and often by emotional apathy." *Webster's Third New International Dictionary,* rev. ed. (1971) s.v. "dementia."

A: After we asked, your following the recommendation because now she cannot go because no nursing home will take her. After her financial assistance granted, we will try to get her into a nursing home. Until anything—no any contrary with the recommendations.

Q: Actually the hospital is waiting for her to get financial assistance so you can place her in a nursing home?

A: That's right.

Q: And if she had money today, the Hospital would release her if she could go to a nursing home, right?

A: If it would find that—the adequate nursing home. You have—you know, these days nursing homes they have a waiting list and also they have, ah, criteria to the kind of patient they are going to take and so on."

And further:

"Q: And she's not been given any particular suicide precautions, such as one to one?

A: No, ah, she didn't really come to the point, in the one to one mainly, so these kind they really, they know what's going on, and then now my judgment feels she to the point deteriorate—and if just like prison condition she has no chance and no anything suddenly come up aggravate I think she most likely, you know, she won't, sort of, attempt to do that again.

Q: She won't do that again? No?

A: Of course, no one can say for sure."

Petitioner's counsel stated at oral argument that he felt this testimony was weak and that he needed something more to obtain the Order. On this appeal, it is conceded that Mrs. Goodwin's testimony was essential to her commitment and that the evidence, without her testimony, was insufficient to meet the statutory proof required for indefinite commitment.

Mrs. Goodwin was called by petitioner's counsel to testify, over objection of her counsel, who took the position that she could not be required to testify. After petitioner's counsel took the position that this was a "civil commitment proceeding and novel objection," the County Judge directed Mrs. Goodwin to take the stand.

Although she answered readily and forthrightly, she responded early that "I have a lack of memory, always have had," and cross examination by petitioner's counsel demonstrated that she did not remember: where she lived, how long she had been in the hospital, her age (although she apparently remembered her birth year, 1915), whether she had tried to kill herself,[3] where her husband lived, where her home was, the year or the month, or that she was on medication. When asked if she would like to be in a nursing home, if that was possible, she testified: "I don't know. I've never been in one before." She went on to testify that she had no place to go, no job and no money.

In its findings, the County Court emphasized "[t]hat the respondent exhibited substantial loss of memory in Court." The Court determined that she was mentally ill "because of her disorientation, impaired functioning," and that "she would not be able to take care of her own needs without outside help or intervention. ... [T]herefore she is a person requiring treatment because there is no appropriate State institution in which the Court can now place her for alternative treatment, the only alternative available at this point and time is the State Hospital. So the commitment will be continued to the State Hospital for an indefinite period."

The Fifth Amendment to the United States Constitution declares: "No person ... shall be compelled in any criminal case to be a witness against himself." The same guarantee is reflected in our North Dakota Constitution, Article I, Section 12.

■ Past lax practices in mental health commitments in this country,[4] and current

---

**3.** Section 12–33–02 N.D.C.C., which prescribed the punishment for attempted suicide, was repealed by S.L.1967, ch. 108, § 1. The remaining sections of chapter 12–33 (which made suicide a crime) were repealed effective July 1, 1975, by S.L.1973, ch. 116, § 41.

**4.** There were no statutory provisions for commitment of the mentally ill in colonial times.

widespread concerns about abuse of mental health commitments around the world[5]

> English common law upheld the right to deprive insane people of their liberty. It was not until the second quarter of the nineteenth century that special laws concerning commitment procedures were enacted in this country, but these early laws had little or no procedural safeguards for personal rights. An 1851 Illinois statute allowed married women and infants to be committed at the request of the husband or guardian without the evidence of insanity required in other cases! As recently as the 1940's some states still allowed mental patients to be committed to jails and prisons via civil commitment procedures. Albert Deutsch, *The Mentally Ill in America: A History of Their Care and Treatment from Colonial Times*, 2d ed., Columbia University Press, New York, 1949, pp. 418–461.

5. Of particular concern is the situation in the Soviet Union, where commitment proceedings are utilized to confine political dissidents, religious activists, ethnic nationalists and persons who have requested permission to emigrate. Andrew Nagorski, a former Newsweek bureau chief in Moscow who was expelled for allegedly engaging in "impermissible journalistic activities," described the treatment accorded one dissident. Sergei Batovrin was an idealistic young Moscow artist who formed a small peace group.

> "Some members of the group were placed under house arrest, others were imprisoned for 'hooliganism'—and Batovrin himself was thrown into a psychiatric hospital for more than a month. When I paid a farewell call on his wife and mother, they reported that at the time, Sergei was being fed heavy doses of depressant drugs—and they expressed the fear that he would be branded a schizophrenic, which is a standard diagnosis for political dissidents." "A Dark Tunnel of Fear," *Newsweek*, October 18, 1982, p. 48.

The political abuse of psychiatry by the Soviet Union has been the subject of several recent magazine articles (David Frum, "Who's Crazy Now?," *National Review*, January 21, 1983, p. 44; "In the Psychiatric Ward," *Newsweek*, November 1, 1982, pp. 31–32; "Playing Politics With Psychiatry," *Newsweek*, February 21, 1983, p. 48.) and a book by Harvey Fireside, *Soviet Psychoprisons*, W.W. Norton & Company, New York, 1979. The Soviet All–Union Society of Psychiatrists and Neuropathologists withdrew from the World Psychiatric Association rather than risk expulsion "for abusing psychiatry for political purposes;" *Newsweek*, February 21, 1983, p. 48.

The grave dangers inherent in commitment proceedings anywhere were succinctly stated by Walter Reich, M.D., in his article "Diagnosing Soviet Dissidents," *Harper's*, August, 1978, pp. 32–37.

make the issue tendered on this appeal a substantial and grave one. The stark fact

> "Certainly, anyone who has worked in psychiatry anywhere recognizes that the profession is heir to abuses of many kinds wherever it is practiced—not only politically motivated ones, which are rare in the West, but, much more commonly, abuses that arise from less spectacular kinds of pressure and needs. People may be misdiagnosed unknowingly because of psychiatric mistakes that grow out of ignorance, out of misconceived or misapplied diagnostic theory, out of an inappropriate reliance on socially defined norms, or out of an irrational or angry response to a patient's words or actions.
>
>      \*    \*    \*    \*    \*    \*
>
> Soviet psychiatry obeys some of the same laws that shape the profession everywhere. Psychiatrists are people. Their professional training builds on what they learn and experience as ordinary men and women. Training does not remove their biases. In some ways, in fact, it tends to strengthen them. There are few objective guideposts for recognizing mental illness. There are no blood tests and few behavioral signs that by themselves guarantee that a person is ill. Diagnostic decisions are based largely on social context. If a person deviates from generally accepted rules of behavior, then the question of mental illness may arise. If the threshold for deviance in a particular society is low—if the boundaries that define normal behavior are narrowly drawn—then the question of mental illness tends to be provoked by behaviors that in other societies go unnoticed.
>
>      \*    \*    \*    \*    \*    \*
>
> If, in addition, pressures are applied by some outside source—say, by the family, or by authorities of one kind or another—that lead the psychiatrist to believe that it would be easier all around if a medical solution were found, then the likelihood that a diagnosis of illness will be made is increased." *Id.*, pp. 35–36.

That some of these pressures and concerns exist in our own country today is evident in a very recent congressional document: "Staff Report on the Institutionally Mentally Disabled Requested by Senator Lowell P. Weicker, Jr., prepared for joint hearings conducted by the Subcommittee on the Handicapped, Committee on Labor and Human Resources and the Subcommittee on Labor, Health and Human Services, Education and Related Agencies, Committee on Appropriations, April 1–3, 1985." .. (Typewritten.)

This resume of concerns about mental health procedures elsewhere is not intended to reflect on present procedures in North Dakota. Rather, it is intended to highlight the potential of abuses to be avoided.

is that incarceration in a barred hospital, for a person who does not require it for his own protection from serious harm or the protection of society from serious harm, is no different than incarceration in a barred jail.[6] The rights of an individual in a mental health commitment proceeding are not guarded by the carefully designed and protective procedures of our criminal rules, or by the same heightened burden of proof required in criminal proceedings,[7] but the results can be the same if commitment procedures are abused.[8] Therefore, we should be cautious not to overlook other fundamental rights in these proceedings, notwithstanding that our State has recently adopted good and thoughtful procedures for mental health commitments.[9]

Some cases have held or suggested the Fifth Amendment right to not be forced to "testify" against yourself applies to mental health incarcerations. *See Tyars v. Finner*, 518 F.Supp. 502 (C.D.Cal.1981), *rev'd and remanded on other grounds*, 709 F.2d 1274, 1276 (9th Cir.1983); *Suzuki v. Quisenberry*, 411 F.Supp. 1113 (D.Hawaii 1976), *modified sub nom. Suzuki v. Yuen*, 617 F.2d 173 (9th Cir.1980) (fifth amendment privilege against self-incrimination held inapplicable but questioned whether involuntary commitment can be supported by silence alone); *Lessard v. Schmidt*, 349 F.Supp. 1078, 1100 (E.D.Wis. 1972), *vacated on other grounds*, 414 U.S. 473, 94 S.Ct. 713, 38 L.Ed.2d 661 (1974), *vacated on other grounds*, 421 U.S. 957, 95 S.Ct. 1943, 44 L.Ed.2d 445 (1975); *on remand*, 413 F.Supp. 1318 (E.D.Wis.1976); *Haskett v. State*, 255 Ind. 206, 263 N.E.2d 529 (1970); *Commonwealth ex rel. Finken v. Roop*, 234 Pa.Super. 155, 339 A.2d 764 (Pa.Super.Ct.1975).

Other cases have held or suggested that the right to remain silent in the face of state incarceration actions does not carry beyond traditional "criminal" proceedings to civil mental health commitments. *See Matter of Baker*, 117 Mich.App. 591, 324 N.W.2d 91 (Mich.Ct.App.1982) (Cavanagh, J., dissenting). *See also People v. Taylor*, 618 P.2d 1127, 1137–40 (Colo.1980); *People v. Keith*, 38 Ill.2d 405, 231 N.E.2d 387, 390 (1967)[10]; *Kraemer v. Mental Health*

---

**6.** The North Dakota Criminal Code recognizes "time spent in custody in a ... mental institution" as "imprisonment" where it is "a result of the criminal charge for which the sentence was imposed;" N.D.C.C. § 12.1–32–02(2).

**7.** In an involuntary mental health commitment procedure the petitioner has the burden of sustaining the petition by "clear and convincing evidence" (§ 25–03.1–19, N.D.C.C.) rather than the "beyond a reasonable doubt" standard required to convict in criminal proceedings (§ 12.1–01–03(1), N.D.C.C.). The "reasonable doubt" standard is not constitutionally required for mental illness commitment; *Addington v. Texas*, 441 U.S. 418, 99 S.Ct. 1804, 60 L.Ed.2d 323 (1979).

**8.** "Involuntary civil commitment to a mental institution has been recognized as 'a massive curtailment of liberty,' (cites omitted) which, because it may entail indefinite confinement, could be a more intrusive exercise of state power than incarceration following a criminal conviction." *Project Release v. Prevost*, 722 F.2d 960, 971 (2d Cir.1983).

**9.** *See* Chapter 25–03.1, N.D.C.C., Commitment Procedures; S.L.1977, Ch. 239.

**10.** The holding in *Keith*, that the privilege against self-incrimination through disclosures in examinations or by testimony revealing one's mental condition extends only to matters that implicate respondents in criminal matters, has been effectively overruled by the enactment of the Mental Health and Developmental Disabilities Code, *Ill.Ann.Stat.*, ch. 91½, § 3–208 (Smith-Hurd 1984–85 supp.), which became effective January 1, 1979. Section 3–208 provides:

"Whenever a petition has been executed pursuant to Section 3–507, 3–601 or 3–701, and prior to this examination for the purpose of certification of a person 12 or over, the person conducting this examination shall inform the person being examined in a simple comprehensible manner of the purpose of the examination; that he does not have to talk to the examiner; and that any statements he makes may be disclosed at a court hearing on the issue of whether he is subject to involuntary admission. If the person being examined has not been so informed, the examiner shall not be permitted to testify at any subsequent court hearing concerning the respondent's admission."

Section 3–807 also concerns the testimony of the psychiatrist or clinical psychologist and provides:

"No respondent may be found subject to involuntary admission unless at least one psychiatrist or clinical psychologist who has examined him testifies in person at the hearing. The respondent may waive the requirement of such testimony subject to the approval of the court."

*Board,* 199 Neb. 784, 261 N.W.2d 626 (1978); *In re Field,* 120 N.H. 206, 412 A.2d 1032, 1034–35 (1980); *Matter of Matthews,* 46 Or.App. 757, 613 P.2d 88 (Or.Ct.App. 1980); *McGuffin v. State,* 571 S.W.2d 56 (Tex.Civ.App.1978).

The United States Supreme Court has not chosen between these views. In the single case where they faced the issue, they sidestepped it (except for Justice Douglas who flatly held the Fifth Amendment did apply to a mental health confinement proceeding), finding an appropriate basis to release the subject without having to decide this critical issue. *McNeil v. Director, Patuxent Institution,* 407 U.S. 245, 92 S.Ct. 2083, 32 L.Ed.2d 719 (1972) (Douglas, J. concurring).

■ Like the United States Supreme Court, we do not decide the issue presented. There are adequate grounds for reversing the commitment in this case, without addressing a fundamental constitutional issue. It is a cardinal rule of decision making to avoid constitutional confrontations where there are appropriate alternative grounds to resolve the case before us. *Mills v. Rogers,* 457 U.S. 291, 102 S.Ct. 2442, 2451, 73 L.Ed.2d 16 (1982); *United States v. Raines,* 362 U.S. 17, 21, 80 S.Ct. 519, 522, 4 L.Ed.2d 524 (1960); *State v. King,* 355 N.W.2d 807, 809 (N.D.1984); *State ex rel. Stutsman v. Light,* 68 N.D. 513, 281 N.W. 777, 780 (1938) (a constitu-

tional question will be decided only when it is properly before the court and the question *must* be decided in order to resolve the controversy).

■ First, the record in this proceeding is statutorily deficient. Our statutory protections mandate: "... an evaluation of a respondent's mental status shall be made only by a licensed psychiatrist or clinical psychologist." N.D.C.C. § 25–03.1–02. Only a physician testified, and only a physician's report was filed with this petition. Neither specifically identified or incorporated the details of a report by a psychiatrist or a clinical psychologist evaluating Mrs. Goodwin's mental illness.[11]

Second, we have a definite and firm conviction that a mistake has been made. Our statutory procedures are explicit that a mental health patient has the right "to the least restrictive conditions necessary to achieve the purposes of treatment." N.D.C.C. § 25–03.1–40(2). Here, the evidence is far from clear and convincing that commitment to the State Hospital is necessary in view of the physician's testimony that a nursing home would be suitable, if financial assistance were available. Where there is an available "treatment program other than hospitalization ... adequate to meet the respondent's needs and ... suffi-

*See Matter of Collins,* 102 Ill.App.3d 138, 57 Ill.Dec. 633, 429 N.E.2d 531 (Ill.App.Ct.1981) for a discussion of the legislative background of the new Illinois statutory provisions. With the exception of the appellate court decision in *Collins,* however, Illinois courts have been reluctant to fully utilize the new mental health provisions. *See, e.g., Matter of Peterson,* 113 Ill. App.3d 77, 68 Ill.Dec. 659, 446 N.E.2d 565 (Ill. App.Ct.1983); *Matter of Powell,* 85 Ill.App.3d 877, 41 Ill.Dec. 160, 407 N.E.2d 658 (Ill.App.Ct. 1980).

11. In North Dakota, while a petition may be accompanied by a written statement from "a psychiatrist, physician, or clinical psychologist who has personally examined the respondent," 25–03.1–08 N.D.C.C., the respondent "shall be examined within a reasonable time by an expert examiner as ordered by the court." § 25–03.1–11 N.D.C.C. The expert examiner's report must contain, among other things, "1. Evaluations of

the respondent's physical condition and *mental status.*" § 25–03.1–11, N.D.C.C. (Emphasis supplied.)

Illinois provides by statute that a person may not be involuntarily committed unless at least one *psychiatrist* or *clinical psychologist* who has examined the person testifies *in person* at the hearing, unless the person has waived the requirement, subject to the approval of the court. *Ill.Ann.Stat.,* ch. 91½, § 3–807 (Smith-Hurd 1984–85 supp.).

The importance of psychiatric testimony in proceedings that can result in deprivation of liberty was emphasized in the recent United States Supreme Court opinion, *Ake v. Oklahoma,* —— U.S. ——, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985), where the Court held that an indigent defendant who makes a preliminary showing that his sanity at the time of the offense is likely to be a significant factor at trial is entitled to have a state-provided psychiatrist examine him on that issue.

cient to prevent harm ...," she is entitled to an order of alternative treatment; N.D. C.C. § 25–03.1–21.

 Poverty is not a criterion for commitment. Financial circumstances may be relevant to "availability" of an alternative treatment program. "Availability" of an apparent alternative was not adequately addressed in the evidence before the trial court for its finding that "the only alternative available at this point and time is the State Hospital."

Accordingly, we reverse the order of indefinite commitment and remand with directions. A new hearing should be held consistent with statutory requirements, at which the availability and appropriateness of alternative treatment in a less restrictive institution, such as a nursing home, must also be fairly considered.

ERICKSTAD, C.J., and LEVINE, VANDE WALLE and GIERKE, JJ., concur.