**In the Interest of Raymond J. RAMBOUSEK.**

**Diane MILLER, Petitioner and Appellee,**

v.

**Raymond J. RAMBOUSEK, Respondent and Appellant.**

**Civ. No. 10401.**

Supreme Court of North Dakota.

March 17, 1983.

Thomas D. Ewing, Dickinson, for respondent and appellant; argued by Thomas D. Ewing, Dickinson.

Appearance by Raymond J. Rambousek.

Owen K. Mehrer, States Atty., Dickinson, for petitioner and appellee; argued by Owen K. Mehrer, States Atty., Dickinson.

ERICKSTAD, Chief Justice.

This is an appeal by the respondent, Ray Rambousek, from an order of the County Court of Stark County, dated January 24, 1983, requiring Ray to receive out-patient treatment at St. Joseph's Hospital in Dickinson for a period of 90 days. We reverse.

On January 18, 1983, Diane Miller, Ray's sister, filed a petition requesting the court to order involuntary commitment of and treatment for Ray under Chapter 25–03.1, N.D.C.C.

An involuntary treatment hearing was held pursuant to Section 25–03.1–19, N.D. C.C., following which the court entered its order requiring Ray to receive out-patient treatment. On appeal, Ray has raised several issues. We conclude that the following issue is dispositive of this appeal, making it unnecessary to reach the other issues:

Whether or not the court's finding is clearly erroneous that there is clear and convincing evidence that Ray is a person requiring treatment under Chapter 25–03.1, N.D.C.C.

■ Section 25–03.1–20, N.D.C.C., provides in part relevant to this case:

"*25–03.1–20. Involuntary treatment hearing—Findings and dispositions.*—If an individual is found at the involuntary treatment hearing to be a person requiring treatment, the findings and conclusions shall be entered in the record of the proceedings and the court may:

1. Order the individual to undergo a program of treatment other than hospitalization; . . ."

A "person requiring treatment" is defined under Subsection 25–03.1–02(11), N.D.C.C.:

"11. 'Person requiring treatment' means either a person:

a. Who is severely mentally ill; or

b. Who is mentally ill, an alcoholic, or drug addict, and there is a reasonable expectation that if the person is not hospitalized there exists a serious risk of harm to himself, others or property. 'Serious risk of harm' means a substantial likelihood of:

(1) Suicide as manifested by suicidal threats, attempts, or significant depression relevant to suicidal potential; or

(2) Killing or inflicting serious bodily harm on another person, inflicting significant property damage, as manifested by acts or threats; or

(3) Substantial deterioration in physical health, or substantial injury, disease, or death resulting from poor self-control or judgment in providing one's shelter, nutrition, or personal care."

For the court to order involuntary treatment of a respondent the petitioner must prove by clear and convincing evidence that the respondent is a person requiring treatment. Section 25–03.1–19, N.D.C.C. The trial court's determination of whether or not there is clear and convincing evidence that a respondent is a person in need of treatment is a finding of fact which this Court will not set aside on appeal unless it is clearly erroneous under Rule 52(a), N.D. R.Civ.P. *Dayap v. Kupperion,* 331 N.W.2d 22 (N.D.1983).

■ Following the treatment hearing, the court entered its findings of fact, conclusions of law, and direction for entry of order using a prepared form whereby the court placed a checkmark beside applicable statements. Using this preprinted format, the court determined that Ray is a person requiring treatment because Ray is mentally ill and there is a substantial likelihood of Ray "killing or inflicting serious bodily harm on another person, inflicting significant property damage, as manifested by acts or threats." The court did not enter any findings which would reflect the underlying basis upon which the court determined that Ray is a person requiring treatment. We believe the preprinted format used by the trial court places severe restrictions on the court's opportunity to customize and particularize its findings and conclusions to each individual case. To facilitate a meaningful review on appeal, we urge the trial court, in future cases, to enter full and specific findings showing the underlying basis upon which the court has reached its determination as to whether or not the respondent is a person requiring treatment under Chapter 25–03.1, N.D.C.C.

Only four persons testified at the treatment hearing, none of whom were capable of giving an expert medical opinion as to whether or not Ray was a person requiring treatment under Chapter 25–03.1, N.D.C.C.: Diane Miller, Ray's sister; Larry Buck, a detective with the Stark County Sheriff's Department; Phyllis Rambousek, Ray's wife from whom he is separated; and Lyn Hurm, owner of a tavern located at Taylor, North Dakota.

Diane Miller, Ray's sister and the petitioner in this case, testified regarding various incidents involving Ray. Ray told Diane he was involved with the Mafia and that if "they couldn't get to him then they would get to me." Ray told Diane that she and her husband "had better be very careful" when they go deer hunting, that she should quit her job, and that "her life was in danger." Diane also testified that Ray "has talked about the Mafia for a long time" and has told her she "better be very careful because [her son Tory] could end up in a refrigerator."

Diane testified that on one occasion she drove Ray to Taylor, North Dakota, after he had engaged in a heated verbal argument with his father. There were two rifles in her car which Ray had previously placed there, and during the drive Ray repeatedly asked Diane if he should load the rifles to which she responded that he should not. Diane further testified that, although Ray was very angry, he did not load the rifles nor did he threaten her with them or point the rifles at anyone.

Diane also testified that on one occasion Ray "scuffled" with her sixteen-year-old son, Kenny, and that as a result of the scuffle Kenny had torn his shirt and had received "neck bruises."

Phyllis Rambousek, Ray's wife from whom he is separated, also testified at the treatment hearing. She testified that during 1977 or 1978 Ray was hospitalized at Heartview for "possible both drugs and drinking," and that Ray has been voluntarily hospitalized approximately 15 times over the past years.

Phyllis testified that on one occasion Ray walked into her house with a gun and said "he had a means of—he was going to protect me." Regarding that occasion, she further testified, however, that Ray did not point the gun in her direction and that, after he drank a can of Pepsi she had offered him, he left without further incident.

Both Diane and Phyllis testified that they have received unusual phone calls from an unidentified source whom they believe to be Ray, where the caller does not speak or give an identity but there is "music playing in the background." Diane testified that on one occasion she received such a call "and it was a chamber of a gun going around."

Larry Buck, a detective with the Stark County Sheriff's Department, testified that he investigated Ray's claim that the mafia was out to get Ray and his family. Larry concluded that Ray "was very paranoid" and that "there was no information or evidence whatsoever to prove any of the allegations that he was telling me." Larry also testified that Ray had been licensed to carry a pistol, but Ray's license was revoked because Larry did not believe Ray should be carrying a pistol. There is no evidence that Ray has had a pistol in his possession since the revocation of his license.

Lyn Hurm, owner of the Lyn P's Pub at Taylor, testified on behalf of Ray that for the past one and one half months Ray has visited her establishment "every day for about twenty minutes and drinks two cans of Pepsi," and that he has never caused any disturbance while frequenting her establishment.

Three medical reports were entered into evidence without objection by the parties: a medical examination report by Dr. Carl R. Westphal, Ph.D., dated December 23, 1982; an outreach worker report by Edward Fields, a psychiatric social worker, dated December 7, 1982; and a medical report filed by Dr. J.C. Johnson, M.D., following a physical examination of Ray by Dr. Johnson on December 8, 1982.

Section 25–03.1–11, N.D.C.C., states that an examination report shall contain:

"1. Evaluations of the respondent's physical condition and mental status.

"2. A conclusion as to whether the respondent meets the criteria of a person requiring treatment, with a clear explanation of how that conclusion was derived from the evaluation required.

"3. If the report concludes that the respondent meets the criteria of a person requiring treatment, a list of available forms of care and treatment that may serve as alternatives to involuntary hospitalization.

"4. The signature of the examiner who prepared the report."

None of the medical reports filed in this case contain a conclusion that Ray poses a serious risk of harm to himself, to others, or to property or that Ray is a person requiring treatment as that term is defined under Chapter 25–03.1, N.D.C.C., and none of the individuals making those reports were called to testify at the treatment hearing.

Mr. Fields, the social worker who interviewed Ray during December, 1982, states in his report:

"Though Mr. Rambousek denies that he would ever aggressively harm anyone, with the traits he is exhibiting and when under stress, he could conceivably become volatile.

"A psychiatric evaluation would be indicated . . . ."

The record contains a "Mental Examination" report by Dr. Westphal regarding Ray which states in relevant part:

"Intelligence is estimated to be in the average range. There was no evidence of homicidal or suicidal ideation or plan. *"Insight and Social Judgment:* Both appeared to be impaired by his paranoid thinking which does not reach psychotic proportions. . . .

"DIAGNOSIS: . . . Paranoid Personality Disorder (evidenced by the expectations of trickery or harm, hypervigilance, avoidance of accepting blame, intense, searching for confirmation of his own point of view). . . .

"IMPAIRMENT: Moderate."

Dr. Johnson gave Ray a physical examination on December 8, 1982. His medical report states that Ray "is alert, cooperative and in no distress. . . . Neurological examination—General neurologic examination reveals no abnormalities."

In *Dayap v. Kupperion,* 331 N.W.2d 22 (N.D.1983), we stated that this Court is not in a position to reevaluate the facts to determine, as a matter of law, whether or not a person is in need of treatment when the underlying question of whether or not the person is mentally ill and is dangerous to himself or others turns on the meaning of the facts "which must be interpreted by expert psychiatrists and psychologists." In this case, no expert witnesses were called to give an opinion as to whether or not, based upon the lay testimony admitted in the case or upon other relevant matters which may be taken into consideration by such experts, Ray is mentally ill and poses a serious risk of harm to himself, to others or to property

so as to constitute, under Subsection 25–03.1–02(11), N.D.C.C., a person requiring treatment.[1] Nor do any of the medical reports which were admitted into evidence contain such a determination.

Upon reviewing the record in this case, we conclude that one could not find, by clear and convincing evidence, that there exists a reasonable expectation that Ray poses a serious risk of harm to himself, to others, or to property, or that Ray is a "person requiring treatment" as defined under Subsection 25–03.1–02(11), N.D.C.C. Accordingly, we conclude that the trial court's finding in that regard is clearly erroneous.

The following statements made by the court to Ray at the conclusion of the treatment hearing demonstrate the court's good intentions:

"So what I am determining here today is this. That you are not at this time able to properly deal with your own personal affairs. And your social relations with those around you.

"And I am ordering that you have treatment to deal with those matters. And to regain your own ability to do so.

\*　　\*　　\*　　\*　　\*　　\*

"And that the behavior—the activities, the assessments before the Court all indicate to me, very clearly, the [that] you do need help.

"Now, if it were severe to the point where you were unable to care for yourself or that I honestly believe that you were a serious threat, either to yourself or to anyone around you, then it would be in-patient treatment that I would order in this matter."

Irrespective of the court's good intentions, our law requires that before a person can be ordered to involuntarily receive hospitalization or alternative treatment the court must find that person to be a person requiring treatment as defined under Subsection 25–03.1–02(11), N.D.C.C. Under

---

**1.** We note that Rule 704, N.D.R.Ev., permits testimony on an ultimate issue: "Testimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact."

that definition, one who is found to be mentally ill, but not severely mentally ill, is not a person requiring treatment unless, by clear and convincing evidence, it is established that there is a reasonable expectation that the person poses a serious risk of harm to himself, to others, or to property. The record in this case does not establish that element. Accordingly, we reverse the court's order requiring Ray to submit to involuntary treatment.

PEDERSON and PAULSON, JJ., concur.

SAND, Justice, concurring specially and dissenting.

I concur in the result and most of the rationale expressed in the opinion, but I do not agree with the following statement in the opinion:

"The trial court's determination of whether or not there is clear and convincing evidence that a respondent is a person in need of treatment is a finding of fact which this Court will not set aside on appeal unless it is clearly erroneous under Rule 52(a), N.D.R.Civ.P."

The statement per se is inconsistent. This is no more legally correct than it is to state that in a criminal bench trial the court's determination that the evidence establishes beyond a reasonable doubt that the defendant is guilty will not be set aside unless it is clearly erroneous under Rule 52(a) because Rule 52(a) only requires some evidence.

A finding is "clearly erroneous when although there is *some evidence* to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been made." *United States v. United States Gypsum Co.,* 333 U.S. 364, 68 S.Ct. 525, 92 L.Ed. 746 (1948). We adopted Rule 52 from the Federal Rule presumptively with the interpretations placed upon the Rule, and as early as *In re Estate of Elmer,* 210 N.W.2d 815 (N.D. 1973), and since then, the construction placed upon Rule 52(a) by the United States Supreme Court has been adopted by this Court. In this respect my special concurrence and dissent in *Dayap v. Kupperion,* 331 N.W.2d 22 (N.D.1983), further ex-

presses my dissent to the unrestricted use of Rule 52(a) to this type of case.

I find it difficult to understand why a strained and squeezed effort is made to fit appeals under North Dakota Century Code § 25–03.1–29 into Rule 52(a), NDRCivP, particularly where a simpler and more correct position is readily available. Our standard of review should be, "After viewing the evidence in the light most favorable to the decision is the evidence clear and convincing?"

In this instance there was and is no need to refer to Rule 52(a) under any concept because the evidence was not clear and convincing.

I do, however, agree that the use of the form for disposition by the trial court should be eliminated for several reasons. It defies logic to assume that in every case a "finding of fact" can be squeezed into one of the predetermined slots. This becomes more objectionable because that the predetermined slots are not "findings of fact" but a conclusion of law. Using the form as devised in this instance tends to make a mockery out of justice. I find nothing wrong in using checklists for some purposes, such as instructions to members of the staff or to attorneys, and such related items, but not for the final disposition of a case or as a "finding of fact."

VANDE WALLE, Justice, concurring specially.

I concur in the result reached by the majority opinion. In *Dayap v. Kupperion,* 331 N.W.2d 22 (N.D.1983), I expressed my concern with regard to the unrestricted application of Rule 52(a), N.D.R.Civ.P., to these appeals. Insofar as the majority opinion in this instance propagates the position of the majority in *Dayap,* I disagree. However, I believe that the county court's decision that Rambousek is in need of treatment is not supported by clear and convincing evidence and I therefore concur with the reversal of the order requiring Rambousek to receive treatment.

Because the position of the majority of this court has been set forth in *Dayap* and now in this case, and because it seems probable that this court will receive a substantial number of appeals pursuant to Section 25–03.1–29, N.D.C.C., as amended effective January 1, 1983, it is not my intent in the future appeals to express my objection on this matter in those instances in which I concur with the result reached by a majority of this court. However, in those instances in which I believe the standard expressed by the majority of the court is contrary to the result I would have reached as a result of the application of the standard I advocated in *Dayap,* I will continue to express my objection.