In the Interest of Thomas GUST.

John J. GUST, Petitioner and Appellee,

v.

Thomas GUST, Respondent
and Appellant.

Civ. No. 11299.

Supreme Court of North Dakota.

Aug. 20, 1986.

Duane Elness, Asst. State's Atty., Cavalier, for petitioner and appellee.

Fleming & DuBois, Cavalier, for respondent and appellant; argued by Lawrence DuBois, Cavalier.

MESCHKE, Justice.

In this expedited appeal, Thomas Gust challenges a mental health order committing him to Jamestown State Hospital and authorizing medication and psychotherapy treatment. Discerning no clear error, we affirm the order.

According to his parents, Thomas has suffered from mental illness since his third year at Mayville State College about ten years ago. It started with "pains in his head" and some strange behavior. He was treated as an outpatient by a psychiatrist and placed on medication. Thomas graduated from Mayville, but several years later he dropped out of a masters degree program at North Dakota State University at Fargo.

In 1979, Thomas was hospitalized and treated again, briefly. He then returned to St. Thomas, lived with his parents, and worked at the Grafton State School for four years. In the spring of 1983, he moved from his parents' home to an apartment in Grafton, but was discharged from his employment at the Grafton School in October, 1983, when he repeatedly failed to report for work. Shortly, his reclusive and strange behavior prompted a petition for involuntary treatment of his mental illness. The Walsh County Court ordered him to undergo treatment other than hospital-

ization for a period of 90 days, but this court reversed, holding that it was procedurally erroneous to allow a physician not personally present in court to testify by telephone. *In Interest of Gust,* 345 N.W.2d 42 (N.D.1984).

What happened after remand of that decision has not been explained in this record, but his parents testified that he disappeared and turned up in Corpus Christi, Texas. Thereafter, they believe he had an unhappy odyssey through the Texas cities of Victoria, Houston, and Dallas during a period of several months. He was in a very debilitated condition, down to 90 pounds from his customary 175 pounds, when a Texas relative finally found him in Dallas. The relative helped place him in the psychiatric ward of a hospital at Garland, Texas for a few weeks. With the aid of his parents, Thomas returned to North Dakota and admitted himself to a Grand Forks hospital for several more weeks of treatment. Then he moved to a group home in Grand Forks and later to the City Mission at Grand Forks, each for a few months.

But, in 1985, Thomas apparently discontinued all medication on his own initiative and wandered again. He went to see a brother in New Orleans. The brother found him a job, but there was "too much stress" and he quit the job. He wandered to Florida, sold his car, and lived in a hotel on money his parents sent until it was gone. His parents sent more money to enable him to return to North Dakota again. When he came back this time, he lived at the City Mission in Grand Forks until January, 1986.

In January, 1986, he returned to live with his parents at St. Thomas. In May, he became increasingly hostile and verbally abusive to his mother. Obsessed with food, he blamed his mother for not feeding him properly as a child and he demanded satisfaction of his cravings for certain foods. Finally, on May 26, 1986, his father petitioned for his involuntary commitment, stating:

"[Thomas] has a long history of mental illness and has been diagnosed as a paranoid-schizophrenic by Dr. John Sullivan within past year. [Thomas] within the past week has become increasingly hostile, using abusive language to his parents. He continually shouts and talks incoherently. [We] are unable to continue caring for [him], he is unable to care for himself and has nowhere to go."

After a preliminary hearing and temporary hospitalization at Jamestown for examination, a treatment hearing was held in Pembina County Court. His parents testified about his history of mental illness, including descriptions of several angry episodes of near violence, his occasional despair about living ("Why don't you shoot me?" and "Why didn't you leave me there [in Texas] to die?"), and his frequently strange behavior ("Can't you hear them talking about me?"). Dr. Srisopark, a staff physician at Jamestown State Hospital who had examined and interviewed Thomas during the temporary commitment, testified about his observations, diagnosis and recommended treatment. And, Thomas testified for himself.

From evidence it viewed as clear and convincing, the Pembina County Court found:

"2. [Thomas] is afflicted with a mental illness diagnosed as schizophrenia, paranoid-type, chronic;

"3. [His] illness is progressive, in that it will become progressively worse if not treated;

"4. The symptom's of the illness include persecutory delusions; abnormal sleep routine; and abnormal thought process. [Thomas] suffers from these symptoms.

"5. As a consequence of his illness, [Thomas] is impaired in that he is unable to maintain interpersonal relations; unable to retain employment; and suffers unrealistic obsessions.

"6. Without treatment, [Thomas] will suffer substantial deterioration in

physical health and is likely to inflict harm upon himself or others;

"7. [Thomas] is likely to benefit from medication administered under closely supervised setting and from inpatient psychotherapy.

"8. Alternative less restrictive treatment is not in the best interest of [Thomas] because ... [he] is in need of close supervision unavailable by less restrictive treatment."

The Court concluded that Thomas required treatment and that alternatives to hospitalization were not in his best interests. The Court ordered that he be hospitalized at Jamestown State Hospital for up to 90 days and authorized the hospital to treat him "through a course of medication and psychotherapy."

■ On this appeal, Thomas asks us to adopt a more exacting standard for reviewing factual findings of the county court than the "clearly erroneous" standard of Rule 52(a), N.D.R.Civ.P. Drawing on a view expressed in a special concurrence and dissent in *In the Interest of Kupperion*, 331 N.W.2d 22 (N.D.1983), he suggests that the "clearly erroneous" standard for appellate review of findings of fact is inconsistent with the "clear and convincing" standard of proof in the trial court for mental health commitment cases. But, we see no incongruity between the two standards. They perform separate functions. As we observed in another type of case (fraud) requiring clear and convincing evidence at trial, "[w]hat matters upon appellate review is whether the trial court's basis for finding the existence of the disputed [facts] is adequately disclosed in the record, considering the ability of the trial court to assess the credibility of the testimony." *Russell Land Company v. Mandan Chrysler-Plymouth, Inc.*, 377 N.W.2d 549, 552 (N.D.1985). We will not set aside a finding that a person needs treatment unless it is clearly erroneous. See *In Interest of Abbott*, 369 N.W.2d 116, 118 (N.D. 1985).

Thomas does not dispute that he is "mentally ill," but he does challenge the suffi-ciency of the evidence that "there is a reasonable expectation that if the person is not hospitalized there exists a serious risk of harm to himself, others or property," so as to make him a "person requiring treatment" under § 25–03.1–02(11), N.D.C.C. That section says:

" 'Serious risk of harm' means a substantial likelihood of:

"(1) Suicide as manifested by suicidal threats, attempts, or significant depression relevant to suicidal potential;

"(2) Killing or inflicting serious bodily harm on another person, inflicting significant property damage, as manifested by acts or threats; or

"(3) Substantial deterioration in physical health, or substantial injury, disease, or death resulting from poor self-control or judgment in providing one's shelter, nutrition, or personal care."

While some of the parents' testimony suggested a suicidal potential, it is evident that the trial court did not rely on this evidence. The trial court found that "[w]ithout treatment, [Thomas] will suffer substantial deterioration in physical health and is likely to inflict harm upon himself and others." Thus, the trial court used the second and third statutory meanings of "serious risk of harm" to make its determination.

From his clinical observations of Thomas during the temporary commitment, Dr. Srisopark testified that Thomas was suffering from schizophrenia, paranoid type, chronic, caused by an imbalance of dopamine, a neurotransmitter in the brain. While the doctor testified that the degree of Thomas' dysfunction was moderate, he also testified that degree of dysfunction substantially impaired Thomas' ability to conduct his personal and social affairs.

On direct examination, Dr. Srisopark testified:

"Q. If Thomas Gust were not hospitalized, do you have any feeling as to whether there is a risk of harm

being caused by him to himself or to other persons?

"A. Yes.

"Q. What is your opinion?

"A. My opinion is that Tom is considered to be dangerous to others and himself, too.

"Q. Do you feel that there is any risk that this individual, without hospitalization, might commit suicide?

"A. About committing suicide, I have not received any information during my interview and I cannot say that for sure. But the physical damage that causing from his behavior, his action, I consider as a self-mutilation, self-punishment, which this action, if continued to be going on like this, it may lead to some other physical damage or, I should say, slowly killing himself.

"Q. Dr., in your opinion, does this individual need treatment or ...?

"A. Yes. Definitely.

"Q. Have you reached a conclusion or decided what type of treatment is required in this instance?

"A. Yes.

"Q. Would you describe it?

"A. The priority is medication. This ha[s] to be done immediately.

"Q. Would medication for this individual on an out-patient, in other words, not hospitalized situation, produce the required effects? Maybe I should rephrase that. Is the treatment that is required in-hospitalization or—out of the hospital?

"A. In the initial period of treatment, the medication should be given in the hospital setting in order to observe his responding to the medication in order to adjust the dose up or down according to his response, and as well as to observe the other effect[s] of medication that might happen.

"Q. You are indicating that hospitalization is necessary for the treatment of this individual?

"A. Yes."

One of Dr. Srisopark's responses on cross examination was significant:

"If he is not hospitalized, the harm to himself is physical harm that is made by himself. For example, sense of punishment, self-mutilation, hypothetically, the self-mutilation can be minor, for example, to slap himself, and then later on, he may cut himself, and later on he may shoot himself, when the degree of dysfunctioning [is] higher."

In response to an inquiry by the trial court, Dr. Srisopark testified:

"The long term prognosis, if the patient does not receive the medication, will be progressive deterioration, going downhill. And, the chance of schizophrenic is not bad as we thought in the past. The schizophrenic can be stable when they reach the plateau, they will remain there forever, and then the patient can function in terms of occupation, in terms of socialization, and use the appropriate leisure time. And, Mr. Gust is in that moderate dysfunctioning, the chance for recovery is great. And, this is the most important time that we have to stop that progressive deterioration, to stabilize that level, so that he can be functioning as well as the others. And, I have seen the patient who received adequate treatment recover from that process, and change into different person."

■ We believe this evidence sufficiently showed a reasonable expectation that there was a serious risk of harm to Thomas from "substantial deterioration in physical health" and from the likelihood that he would "inflict harm upon himself and others," as the trial court found.

Thomas argues that his recent history, living by himself at the City Mission in Grand Forks and with his parents for the last 18 months, without medication, demonstrates that he can care for himself and that he doesn't need medication. But this argument ignores both his most recent history and the doctor's testimony about his progressive deterioration. Even Thomas, in his testimony, was tentative and uncertain about whether he could care for

himself by again living at the City Mission in Grand Forks.

Because the medicine prescribed for Thomas by Dr. Srisopark will have "certain short term and long term effects," counsel for Thomas also argues that "there is more at risk for Mr. Gust than merely losing his freedom for a ninety day commitment." There may be situations where the evidence would show that the other effects of medication prescribed to alleviate mental illness are so extreme that the involuntary patient may nevertheless be entitled to decline treatment. Compare *Rivers v. Katz*, 67 N.Y.2d 485, 504 N.Y.S.2d 74, 495 N.E.2d 337 (N.Y.Ct.App.1986). But, the evidence in this case does not present an appropriate issue as to whether the cure may be worse than the illness. The finding that Thomas required treatment was supported by uncontroverted medical testimony.

We discern no clear error in the trial court's finding that Thomas required treatment. Therefore, we affirm.

ERICKSTAD, C.J., and GIERKE, JJ., concur.

VANDE WALLE and LEVINE, JJ., concur in the result.