In the Interest of M.H., Respondent and Appellant.

Civ. No. 910296.

Supreme Court of North Dakota.

Sept. 20, 1991.

Gregory Ian Runge, Bismarck, for respondent and appellant.

Paul C. Seado, Asst. States Atty., Bismarck, for petitioner and appellee.

ERICKSTAD, Chief Justice.

M.H. appeals from an order of the Burleigh County Court committing her to the St. Alexius Medical Center at Bismarck for 90 days to receive treatment for mental illness. We affirm.

On July 12, 1991, M.H.'s son petitioned the county court to involuntarily commit his mother. The petition alleged that M.H. was mentally ill and, as a result of such condition, there was a serious risk of harm to herself, and others, if she was not hospitalized. The petition alleged that M.H. was confused, agitated, paranoid, was not taking her medication, was entering people's houses without permission, and was driving dangerously while in her agitated state.

M.H. was evaluated by Dr. Shen Thakor, a psychiatrist with St. Alexius Medical Center, on July 12, 1991, who had seen her as a patient since 1985 or 1986, although not on a continuous basis. Dr. Thakor described M.H. as confused, hyper, agitated, unreasonable, and unable to care for herself. He concluded that M.H. was suffering from mental illness and that such mental illness posed a serious risk of harm to M.H. due to substantial deterioration in her mental health. Dr. Thakor also noted that any alternatives to involuntary hospitalization would not be in the best interests of M.H., or others.

On July 17, 1991, at a preliminary hearing, the Burleigh County Court ordered M.H. to receive treatment at St. Alexius Medical Center for a period not to exceed 14 days as set forth in section 25–03.1–17, N.D.C.C.

Thereafter, a treatment hearing was held on July 23, 1991, to determine if M.H. was mentally ill and required further treatment. Dr. Thakor testified at the treatment hearing that M.H. was suffering from schizo affective schizophrenia. He further testified that, in his opinion, there would be a substantial deterioration in M.H.'s mental health if she were not to remain in the hospital. Dr. Thakor said that if M.H. wasn't treated, her physical health was likely to deteriorate as well. Based largely on the testimony of Dr. Thakor, and that M.H. had been readmitted to the hospital, apparently for similar mental problems, twice within approximately two weeks of having been discharged at a prior treatment hearing, the trial court ordered M.H. to receive involuntary hospitalization.

■ Initially, we note that our review in involuntary commitment cases is governed by section 25–03.1–29, N.D.C.C. On appeal, our review is limited to a review of the procedures, findings, and conclusions of the lower court. *In the Interest of M.B.*, 467 N.W.2d 902, 903 (N.D.1991); *Kottke v. U.A.M.*, 446 N.W.2d 23, 26 (N.D.1989). Furthermore, when we review a trial court's determination that there is clear and convincing evidence that the person in question requires treatment, we treat the determination as a finding of fact and will not set it aside unless it is clearly erroneous under Rule 52(a), N.D.R.Civ.P. *In the Interest of M.B.*, 467 N.W.2d at 903; *In Interest of Abbott*, 369 N.W.2d 116, 118 (N.D.1985).

M.H., through counsel, first argues that a determination that a civil commitment is sustained by clear and convincing evidence is a conclusion of law and not a finding of fact. She argues that any such determination should be fully reviewable by this Court and not be limited by the clearly erroneous standard under Rule 52(a) N.D.R.Civ.P. She asserts that this Court

in fact does make a full review of the lower court's determination even while calling it a clearly erroneous standard.

We first note that in prior decisions, a majority of our Court has expressed the view that the trial court's determination of whether or not there is clear and convincing evidence that the respondent is a person in need of treatment is a finding of fact which we will not set aside on appeal, unless it is clearly erroneous under Rule 52(a), N.D.R.Civ.P. *In the Interest of T.A.*, 472 N.W.2d 226, 227 (N.D.1991); *In the Interest of M.B.*, 467 N.W.2d 902 (N.D.1991); *In the Interest of R.N.*, 450 N.W.2d 758 (N.D.1990); *Kottke v. U.A.M.*, 446 N.W.2d 23 (N.D.1989); *In the Interest of Gust*, 392 N.W.2d 824 (N.D.1986). This Court has previously dealt with this issue. Justice Meschke, writing for the Court in *Gust*, addressed the issue as follows:

"On this appeal, Thomas asks us to adopt a more exacting standard for reviewing factual findings of the county court than the 'clearly erroneous' standard of Rule 52(a), N.D.R.Civ.P. Drawing on a view expressed in a special concurrence and dissent in *In the Interest of Kupperion*, 331 N.W.2d 22 (N.D.1983), he suggests that the 'clearly erroneous' standard for appellate review of findings of fact is inconsistent with the 'clear and convincing' standard of proof in the trial court for mental health commitment cases. But, we see no in-

congruity between the two standards. They perform separate functions. As we observed in another type of case (fraud) requiring clear and convincing evidence at trial, '[w]hat matters upon appellate review is whether the trial court's basis for finding the existence of the disputed [facts] is adequately disclosed in the record, considering the ability of the trial court to assess the credibility of the testimony.' *Russell Land Company v. Mandan Chrysler–Plymouth, Inc.*, 377 N.W.2d 549, 552 (N.D.1985). We will not set aside a finding that a person needs treatment unless it is clearly erroneous. See *In Interest of Abbott*, 369 N.W.2d 116, 118 (N.D.1985)."

*Gust*, 392 N.W.2d at 826.

The statutory definition of a "person requiring treatment" as set out in section 25–03.1–02(10), N.D.C.C., first requires that the person be "mentally ill." M.H. is concededly mentally ill. Over this issue there is no debate.

Secondly, the statutory definition requires there be a "reasonable expectation that if the person is not treated there exists a serious risk of harm to that person, others, or property."[1] This is the issue that is crucial to this appeal. "Serious risk of harm" is further statutorily defined in subsections (a) through (d) of section 25–03.1–02(10), N.D.C.C.[2]

---

**1.** We think it is important to briefly note that the statutory definition of a person requiring treatment is not the same as a medical opinion or diagnosis that such person is in need of treatment. It may well be "conclusive" from a medical standpoint that a given individual requires treatment for that person's optimum health, but still not satisfy the statute. In this sense, a court should not accept as conclusive an opinion of a medical expert that a person requires treatment, unless that opinion is supported by facts. In this case, the supporting facts are not overwhelmingly convincing but in light of Rule 52(a), N.D.R.Civ.P., we think they are sufficient to sustain the decision of the trial court.

**2.** Section 25–03.1–02(10), N.D.C.C., reads:

" 'Person requiring treatment' means a person who is mentally ill or chemically dependent, and there is a reasonable expectation that if the person is not treated there exists a serious

risk of harm to that person, others, or property. 'Serious risk of harm' means a substantial likelihood of:

a. Suicide as manifested by suicidal threats, attempts, or significant depression relevant to suicidal potential;

b. Killing or inflicting serious bodily harm on another person or inflicting significant property damage, as manifested by acts or threats;

c. Substantial deterioration in physical health, or substantial injury, disease, or death based upon recent poor self-control or judgment in providing one's shelter, nutrition, or personal care; or

d. Substantial deterioration in mental health which would predictably result in dangerousness to that person, others, or property, based upon acts, threats, or patterns in the person's treatment history, current condition, and other relevant factors."

■ The trial court based its finding that M.H. was a person requiring treatment primarily on the definition of "serious risk of harm" contained in subsection (d) of section 25–03.1–02(10), N.D.C.C., which provides:

"d. Substantial deterioration in mental health which would predictably result in dangerousness to that person, others, or property, based upon acts, threats, or patterns in the person's treatment history, current condition, and other relevant factors."

We thus review the record to determine whether or not the trial court's finding that M.H. was in need of treatment under the provisions of section 25–03.1–02(10)(d) was clearly erroneous in light of the requirement that the court be convinced by clear and convincing evidence.

The record demonstrates that M.H. is suffering from mental illness.[3] Furthermore, the record demonstrates that without forced hospitalization M.H. would be at serious risk of substantial deterioration in her mental health.[4] The issue thus narrows to whether or not this likely deterioration of M.H.'s mental health would predictably result in dangerousness to her, others, or property. Section 25–03.1–02(10)(d), N.D.C.C.

3. At the treatment hearing, Dr. Thakor testified in relevant part as follows:
"Q And have you formed a diagnosis as to her mental condition at this time?
"A Yes, we have.
"Q Would that diagnosis also include information you gathered within the last four or five years such as your opportunity to observe her within the last four or five years?
"A Yes.
"Q Also history of the patient's condition?
"A Yes.
"Q What is your diagnosis at this time?
"A Schizo affective schizophrenia.
"Q Would that be a chronic condition?
"A Yes. In her case it's a chronic condition."

4. Dr. Thakor further testified at the treatment hearing:
"Q Doctor, in your opinion would this condition result in—would her current condition pose a possibility of dangerousness to herself or others?
"A Possibly to herself, not to others.
"Q Why do you say that?
"A Even in the hospital setting she is very hyper, restless, demanding, constantly repeating inappropriate statements, very preoccu-

In this case, the record discloses little evidence that M.H. presents any danger to others, or property. Dr. Thakor, when asked "would her current condition pose a possibility of dangerousness to herself or others?" answered: "Possibly to herself, not to others." Thus our inquiry focuses on whether or not M.H.'s likely mental deterioration would predictably result in danger to M.H.

The record indicates that M.H. had been admitted by emergency room doctors three times within a two-month period. Apparently, one or more of these emergency room episodes occurred shortly after M.H. had been discharged following a prior treatment hearing presided over by the committing judge in this case. When M.H. would arrive at the emergency room she was described as "scared, panicky, fearful, and paranoid." M.H. would voice concerns about finding a "safe place." According to Dr. Thakor, M.H. could never define what it was, or where she wanted to go.

Dr. Thakor further testified that M.H.'s repetitive thinking could pose some danger to M.H. His testimony in response to questions from counsel for the petitioner follows:

pied, wanting sexual activity with a male, unable to listen to the nursing staff for simple requests that are made, for constantly coming to the nurses desk with one demand or another, trying to get out of the hospital even though repeatedly requested not to do so by the staff, making statements like, 'My ex-husband and children are out in the waiting room waiting to see me,' when they aren't there, but mainly her agitation and hyperactivity and inappropriate thinking.
"Q Would it be your opinion that at this time there would be a substantial deterioration in her mental health?
"A If she does not continue to follow medical advice, remain in the hospital, take her medications like we have asked her to do, yes.
"Q If she didn't, if she wasn't treated, there would continue to be a deterioration in her mental health?
"A Right.
"Q That would be a substantial deterioration?
"A That would be a substantial deterioration."

"Q Doctor, if she is not treated, would you say her mental state would be such that she couldn't take care of herself, such as make meals or manage her money?

"A It will be in a very haphazard or disorganized fashion. Her preoccupation with safe place, with wanting to be with her children, checking up constantly on her children, that drive is so intense it prevents her from doing some of the other things that an average person would do.

\* \* \* \* \* \*

"Q Doctor, the condition you just described, would that have an affect on everyday living such as driving a car, for example?

"A Yes, it could because her preoccupation with this thinking is so intense that her mind is more focussed on that and she may be oblivious to simple daily routine or some safety thing that may need to be done.

\* \* \* \* \* \*

"Q ... The state that you just described, would a person suffering from that condition—would you agree that it would be—she might have a problem crossing the street? For example, she would be thinking about something else rather than what she should be thinking about, such as other vehicles?

"A It's quite possible, yes."

According to Dr. Thakor, M.H.'s thinking disorder could not be controlled without further medication such as Haldol, which M.H. refused to take. Dr. Thakor testified in response to the following relevant questions:

"Q Doctor, why won't Lithium alone do the job in this case?

"A Because she has a mood disorder along with a thinking disorder, and Lithium basically will help the up and down mood disorder, but the disorganized thinking, the paranoid thinking, the delusional thinking, that will not be helped by Lithium alone, and something else has to be added to it.

"Q Okay. And what kind of treatment would you recommend or what are you recommending regarding the thinking disorder?

"A We have suggested to her that she take Haldol or similar medication, but ideally if she would take Clozaril, the new medication that has come out for treatment of chronically mentally ill, that's what we would recommend."

Apparently because of the possible dangerous side effects of taking clozaril, a patient would not be given this drug unless under close observation such as is possible in a hospital. Dr. Thakor would also not administer this drug without the patient's consent.

Given Dr. Thakor's testimony and M.H.'s recent conduct, the trial court held in relevant part as follows:

"The evidence presented at the hearing establishes clearly that the respondent is a mentally ill person. Dr. Thakor's testimony indicates that. The question, certainly, is whether or not her mental status or her mental condition constitutes what the law describes as a person requiring treatment. And given the background, the fact that I was in this position and dismissed the case against Miss H. or involving Miss H. on August 26,[5] I've naturally been very concerned about the testimony that I've heard here today and the fact that there was less than two weeks that elapsed after she was discharged by this Court's order on the 26th and her being readmitted to the hospital not once, but twice apparently."

■ We recognize that the trial court was in the best position to weigh the testimony of the doctor and the others who testified. When viewing a cold record, this Court must give some deference to the trial court's interpretation of witnesses' testimony. As we said in *Weiss v. Anderson*, 341 N.W.2d 367 (N.D.1983):

---

**5.** Apparently Judge Riskedahl meant to say June 26, the date of the previous treatment hearing, instead of August 26.

"The trial court is the ultimate arbiter of the credibility of the witnesses and the weight to be given their testimony. When more than one reasonable inference can be drawn from the credible evidence, the reviewing court must accept the inference drawn by the trier of fact." *Weiss,* 341 N.W.2d at 371. *See also, Royal Jewelers, Inc. v. Kopp,* 365 N.W.2d 525, 527 (N.D.1985); *Martinson Bros. v. Hjellum,* 359 N.W.2d 865, 869 n. 2 (N.D.1985).

The trial court, which saw and heard the witnesses testify, was in a much better position to weigh the evidence than we as an appellate court, with only the cold sterile record, are able to do. "We have repeatedly stated a 'cold record' is no substitute for the opportunity of the trial judge to observe and evaluate the witnesses and that we are unwilling to 'second-guess' the trial court in matters which depend upon the trial judge's observations of the proceeding." *Hansen v. Winkowitsch,* 463 N.W.2d 645, 647 (N.D.1990); *see also Byron v. Gerring Industries, Inc.,* 328 N.W.2d 819, 822 (N.D.1982) (same rule of deference applies to a trial court's evaluation of expert testimony).

Although the doctor used the term possibility rather than the more appropriate term probability when describing what danger M.H. could be confronted with, we believe the doctor was convinced she was in need of treatment pursuant to section 25–03.1–02(10), N.D.C.C., from his other testimony and that the trial court's findings were not clearly erroneous. In light of the statutory requirement that proof of dangerousness and need for treatment be proved by evidence that is clear and convincing, it would have been better had the attorney for the petitioner phrased the question in terms of probability rather than possibility and it is hoped that counsel in the future will do that. If that is done, the doctor will be faced with the issue more clearly and the response will be more pertinent.

The order of the county court ordering M.H. to involuntary hospitalization is affirmed.

GIERKE and MESCHKE, JJ., concur.

VANDE WALLE, Justice, dissenting.

In *Dayap v. Kupperion,* 331 N.W.2d 22 (N.D.1983), I expressed my concern with regard to the unrestricted application of Rule 52(a), NDRCivP, to these mental health appeals. *See* 331 N.W.2d at 29 (VandeWalle, J., concurring specially). The substance of that special concurrence was the concern as to whether or not the determination that a person is in need of treatment as defined by the statute is a finding of fact. Because the statute requires that the petition be sustained by clear and convincing evidence if the respondent is to be involuntarily committed to a treatment center and there was no dispute as to the facts in that case, I concluded our function on appeal was to determine whether or not the undisputed facts clearly and convincingly indicated the respondent was in need of treatment as a matter of law.

Subsequently, *In Interest of Rambousek,* 331 N.W.2d 548 (N.D.1983), was decided by this Court, and in another special concurrence I adhered to the position I took in *Dayap* concerning the unrestricted application of Rule 52(a) and observed that because it seemed probable that there would be a number of appeals pursuant to section 25–03.1–29, NDCC, it was not my intent in the future to express my objection as to the standard of review in those cases in which I concurred with the result reached by the majority. I stated that "in those instances in which I believe the standard expressed by the majority of the court is contrary to the result I would have reached as a result of the application of the standard I advocated in *Dayap,* I will continue to express my objection." 331 N.W.2d at 552–53 (VandeWalle, J., concurring specially). In *In Interest of Gust,* 392 N.W.2d 824 (N.D.1986), I concurred in the result because of the discussion concerning the application of Rule 52(a) to these proceedings.

I dissent because this is a case in which I believe "the standard expressed by the majority of the court is contrary to the result I would have reached as a result of the application of the standard I advocated in *Dayap,*" *i.e.,* I believe it is our function to

determine whether or not the facts as found by the trial court clearly and convincingly indicate the respondent is in need of treatment. I cannot agree that the record reveals clear and convincing evidence that M.H. is a person requiring treatment as defined in section 25–03.1–02(1), NDCC. I have no difficulty determining there is clear and convincing evidence to sustain a finding that M.H. is mentally ill and there is adequate evidence to determine that she is in need of treatment in a generic or medical sense. But, to require treatment, the Legislature has required a different standard as set forth in section 25–03.1–02(1) and evidence that M.H. would benefit from treatment in a medical or generic sense is not sufficient. Contrary to the majority opinion, I cannot conclude that evidence that M.H. would "possibly" be a *danger to herself, that there would be* "substantial" deterioration in her mental health if she was not committed, and that it is "possible" that she would be injured because her illness would affect her everyday living is sufficiently clear and convincing to require treatment under the statute.

I understand that few medical professionals are willing to give unqualified opinions, but, in view of the statutory requirements of section 25–03.1–02(10), NDCC, which requires clear and convincing evidence of a "substantial likelihood of serious risk of harm to that person, others, or property," the evidence in this case is insufficient to order commitment. I would reverse the decision of the trial court.

LEVINE, J., concurs.