**In the Interest of J.A.D., Respondent and Appellant.**

**Civ. No. 920298.**

Supreme Court of North Dakota.

Nov. 5, 1992.

As Corrected Nov. 20, 1992.

---

Randall L. Hoffman, Jamestown, for respondent and appellant.

Wendy P. Sulewski, State's Atty., Jamestown, for appellee.

VANDE WALLE, Justice.

J.A.D. appealed from an order of the county court of Stutsman County requiring that he be hospitalized and treated for mental illness for a period not to exceed 90 days. We reverse.

On September 3, 1992, a preliminary hearing concerning the petition for J.A.D.'s involuntary treatment was held in accordance with section 25–03.1–17, NDCC. J.A.D. was committed to the North Dakota State Hospital under a temporary treatment order for a period of 14 days. NDCC § 25–03.1–17. On September 16, 1992, an involuntary treatment hearing was held pursuant to section 25–03.1–19, NDCC. At the treatment hearing the county court found that J.A.D. "suffers from a mental illness, which substantially impairs his capacity to use self-control, judgment and discretion, and that there is a substantial likelihood of substantial harm to himself as demonstrated by past acts which indicate

that he is not able to take advantage of things available to him outside the State Hospital." The county court entered an order requiring that J.A.D. receive a maximum of 90 days treatment at the North Dakota State Hospital.

The two issues before us on this appeal are:

1. Whether the trial court was clearly erroneous in its determination that there is clear and convincing evidence that J.A.D. suffers from a mental illness which substantially impairs his capacity to use self-control, judgment, and discretion.

2. Whether the trial court was clearly erroneous in its determination that there is clear and convincing evidence that there exists a substantial likelihood of substantial harm by J.A.D. to himself as demonstrated by past acts which indicate that he is not able to take advantage of things available to him outside of the State Hospital.

Before a court can issue an order for an involuntary treatment, the petitioner must prove by clear and convincing evidence that the respondent is a person requiring treatment. NDCC § 25–03.1–19. *Kottke v. U.A.M.*, 446 N.W.2d 23 (N.D. 1989). The determination that an individual is a "person requiring treatment" under the statutory definition is a two-step process: (1) the court must find that the individual is mentally ill, and (2) the court must find that there is a reasonable expectation that if the person is not hospitalized there exists a serious risk of harm to himself, others, or property. NDCC § 25–03.1–02(10);[1] *Kottke, supra.* The scope of review we follow in appeals under section 25–

1. Section 25–03.1–02(10) reads:

"'Person requiring treatment' means a person who is mentally ill or chemically dependent, and there is a reasonable expectation that if the person is not treated there exists a serious risk of harm to that person, others, or property. 'Serious risk of harm' means a substantial likelihood of:
a. Suicide as manifested by suicidal threats, attempts, or significant depression relevant to suicidal potential;
b. Killing or inflicting serious bodily harm on another person or inflicting significant

property damage, as manifested by acts or threats;
c. Substantial deterioration in physical health, or substantial injury, disease, or death based upon recent poor self-control or judgment in providing one's shelter, nutrition, or personal care; or
d. Substantial deterioration in mental health which would predictably result in dangerousness to that person, others, or property, based upon acts, threats, or patterns in the person's treatment history, current condition, and other relevant factors."

03.1–29, NDCC, is limited to the examination of the procedures, findings, and conclusions of the lower court. NDCC § 25–03.1–29. The majority of our court has held that the trial court's determination there is clear and convincing evidence the respondent is a person in need of treatment is a finding of fact which we will not set aside on appeal unless it is clearly erroneous. Rule 52(a), NDRCivP; *Kottke, supra; In Interest of Kupperion*, 331 N.W.2d 22 (N.D.1983). We therefore focus on the evidence that J.A.D. was mentally ill and that there was a substantial likelihood of substantial harm to J.A.D. to determine if there is clear and convincing evidence to support the findings of the trial court. *In Interest of M.H.*, 475 N.W.2d 552 (N.D. 1991).

■ The record demonstrates that J.A.D. is suffering from a mental illness.[2] The record also fairly indicates that without treatment, J.A.D.'s mental health would be at a substantial risk of deterioration.[3] However, as we have previously held, the need for treatment alone is not sufficient to order hospitalization. *In Interest of M.S.H.*, 466 N.W.2d 151 (N.D.

1991). The issue is therefore whether or not this likely deterioration of J.A.D.'s mental health will predictably result in dangerousness to himself, others, or property. NDCC § 25–03.1–02(10)(d); *M.H., supra.*

The record is tenuous as to whether J.A.D. poses a danger to himself, to others, or to property. Testimony at the hearing indicates that J.A.D. may be a danger to himself, though most likely not a danger to others or to property.[4] The concern over J.A.D.'s dangerousness to himself centered around his homelessness and his ability to take care of himself, such as his resourcefulness at getting food and proper nutrition, and his propensity to seek out shelter during the winter months.

Of the three witnesses testifying in support of the involuntary treatment, one was a human service center caseworker who dealt with homeless and mentally ill people, another was with a religious and philanthropic organization known for its assistance to the very poor. These witnesses, commendably, were concerned with J.A.D.'s physical and mental well being. Their testimony describing some of J.A.D.'s more bizarre behavior may provide

---

2. At the treatment hearing, Dr. Dennis Kottke, a psychiatrist at the Adult Psychiatric Unit at the North Dakota State Hospital, testified that:

"Q: Doctor Kottke, in your position as a psychiatrist at the North Dakota State Hospital, have you had occasion to have contact with and do mental status exam of [J.A.D.]?

"A: Yes I have. I've been assigned to him since he was admitted. I've tried to evaluate him, it's been very difficult because he by and large has refused to talk to me at any length and has often given very circumstantial and wandering kind of answers to questions, has refused to answer even simple, basic questions quite often, but gradually over the period of approximately two and one-half weeks he's been in the hospital, we've pulled together some history. In addition, my social workers have had contact with his mother.... As we've pieced this together, I think we have some understanding of his current status.

"Q: O.K. Based on the contact you've had with him as long, as well, as the historical things we're able to get in and of course the things from the community, things that were happening in Minot, were you able to determine whether or not he's suffering from a mental, organic, or emotional disorder?

"A: ... [H]e does have a mental disorder.... [I] have the impression that it's most

likely he has a bipolar disorder, manic type, with paranoid psychotic features.... The other spectrum that it would be within would be possibly schizophrenia with a paranoid type of schizophrenia and/or possibly with what we call a schizo-effective disorder which would be a schizophrenic-type illness at times and other times an affective-kind of illness with mood disorder component. I think definitely [J.A.D.] fits somewhere in that, that, end of the spectrum and most likely is a bipolar disorder.... I think he is grandiose and, quite frankly, delusional."

3. Testimony by Dr. Kottke indicated that J.A.D. is much more in tune with reality while under the strict and supervised conditions of the State Hospital where he can receive therapy and be administered drugs.

4. Dr. Kottke responded to questions regarding J.A.D.'s propensity for dangerousness to himself, others, and property in relevant part:

"Q: From both the other two witnesses and you, Dr. Kottke, then, what we really seem to have here is not so much a danger to others as to himself, we simply just, not being able to adequately take care of his own needs because of the confusion and the delusions?

"A: That's what it seems like."

a basis for an expert witness to conclude that J.A.D. was mentally ill, but the testimony is not clear and convincing that J.A.D. is in need of treatment in the sense of our mental health commitment statutes.

Dr. Kottke, the third witness to testify in support of involuntary treatment, provided clear and convincing evidence that J.A.D. is mentally ill, and much of his testimony was concerned with that issue. However, Dr. Kottke's testimony that J.A.D. was in need of treatment as defined by the statutes was not clear and convincing. Dr. Kottke's conclusion, that absent commitment to the State Hospital there exists a strong risk of harm to J.A.D., was also premised on his concern that J.A.D. would not seek appropriate shelter when winter came, as it surely will, in North Dakota.

All three witnesses expressed concern that because J.A.D. was a recent arrival from the deep South he was not aware of the severe cold which the winter season may bring to North Dakota and would not seek appropriate food and shelter. These concerns were essentially premised on isolated incidents in which J.A.D. did not take advantage of shelter the caseworker had arranged, the fact that J.A.D. took shelter in abandoned buildings, that he talked about obtaining a hotplate, and the fact that he once placed food he received from the private organization in a garbage dumpster because, according to the witness, he could not remember where he obtained the food and was afraid to eat it. J.A.D. denied that was the reason he placed the food in the dumpster, alleging instead that he placed it there for safekeeping. Assuming the witness is correct, such action may be indicative of mental illness, but is not clear and convincing evidence that J.A.D. cannot care for himself. To the contrary, it might as well indicate J.A.D. is aware of his health and will not take action which would endanger it. The witness, in fact, agreed that despite several months of homeless status, J.A.D. was in good physical condition, thus indicating an ability to care for himself under circumstances which many of us would consider adverse and with which we perhaps would not contend as successfully as J.A.D. *See In Interest of R.N.,* 450 N.W.2d 758 (N.D.1990) [no deterioration in physical health due to poor judgment].

Not all homeless people are mentally ill and in need of treatment. Homelessness may in some instances be a product of mental illness, but it may also be the result of economic hardship or simply lifestyle choice. We cannot categorize homeless people as people in need of compulsory mental therapy simply because they do without a traditional home, kitchen, plumbing, or electricity. Homeless people may be very resourceful in obtaining food and shelter, as evidenced by J.A.D. seeking out the Salvation Army and social programs offered by the various state and private agencies in the community. J.A.D. has been receiving food and meals, and has sought shelter. Because he did not make use of the shelter which he was offered during the summer months is not necessarily indicative of a propensity to not seek shelter in the winter months. J.A.D. had the wherewithal to travel to North Dakota, and we can presume that he has the wherewithal to leave. In the winter, he may seek assistance for shelter as he has in the past, or simply leave the state for warmer locations. There is no presumption that J.A.D., as a homeless person, will neither be able to fend for himself during the winter months nor be able to take care of his needs.

■ The burden of proof in these proceedings is with the petitioner and there is a presumption in favor of J.A.D. that he does not require treatment. NDCC· § 25–03.1–19; *In Interest of Rosenthal,* 392 N.W.2d 796 (N.D.1986); *Kupperion, supra.* The record in this case is not unlike *In Interest of M.B.,* 467 N.W.2d 902, 904 (N.D.1991) in which the expert witness testified that if M.B. was not involuntarily committed and monitored on a regular medication program, there "probably" would be "problems as far as taking care of his day to day needs, food and shelter and that type of thing." We concluded that:

"[a]t best the record leads only to the conclusion that M.B. is a person who

would *benefit* from treatment with medication and that such treatment is only possible if he were hospitalized, because otherwise he refuses to take medication. That is not the statutory standard which authorizes our courts to commit the mentally ill. The standard for involuntary commitment remain [sic] clear and convincing proof that the mentally ill individual is a person who *requires* treatment as defined by the statute. *In Interest of R.N.*, 450 N.W.2d 758 (N.D.1990). That standard was not met here."

*M.B., supra* at 904. We likewise conclude that the standard was not met in this case.

Our review of the finding that J.A.D. may be a danger to himself, others, or property is governed by the requirement that the finding be supported by clear and convincing evidence. Here, whether we apply the scope of review as adopted by the majority of our court, *Kottke, supra,* or the view of a minority of our court, that it is our function to determine whether or not the facts as found by the trial court clearly and convincingly indicate that the respondent is in need of treatment, *M.H., supra,* at 557 [VandeWalle, J., dissenting]; *Kupperion, supra,* at 29 [VandeWalle, J., concurring specially], the result is the same. There simply is not enough evidence to overcome the presumption that J.A.D. does not require treatment as that term is defined by section 25–03.1–02(10), NDCC.

■ We are also troubled by the trial court's finding that alternative, less restrictive treatment is inappropriate for J.A.D. When an individual is found by a trial court to be a "person requiring treatment" under section 25–03.1–02(10), NDCC, he or she has the right to the least restrictive conditions necessary to achieve the purposes of treatment. NDCC §§ 25–03.1–21; 25–03.1–40(2). We have held that in applying section 25–03.1–21, NDCC, the trial court

must make a two-fold inquiry: (1) whether or not a treatment program other than hospitalization is adequate to meet the individual's treatment needs, and (2) whether or not an alternative treatment program is sufficient to prevent harm or injuries which an individual may inflict upon himself or others. *Kottke, supra.* Again the trial court must determine by clear and convincing evidence that alternative treatment is not adequate or that hospitalization is the least restrictive alternative; and again, the majority of this court has held that this determination by the trial court will not be set aside on appeal unless it is clearly erroneous under Rule 52(a), NDRCivP. *Kottke, supra; In Interest of Palmer,* 363 N.W.2d 401 (N.D.1985); *Schmidt v. Daugherty,* 332 N.W.2d 217 (N.D.1983).

■ Section 25–03.1–21, NDCC,[5] requires a "report assessing the availability and appropriateness for the respondent of treatment programs other than hospitalization which has been prepared and submitted by the state hospital...." Here, Dr. Kottke filed a report which indicated that alternative treatment programs were available at J.A.D.'s home in a southern state, but that they would not be sufficient to meet J.A.D.'s treatment needs because J.A.D. was "isolative, grandiose, and confused with delusional thinking." We are not convinced such a report adequately complies with the statutory mandate. *See, e.g., O'Callaghan v. L.B.,* 447 N.W.2d 326 (N.D.1989); *Rosenthal, supra; In Interest of Goodwin,* 366 N.W.2d 809 (N.D.1985).

Little other evidence supports the trial court's one-sentence conclusion that "alternative treatment is not appropriate at this time, and that a treatment order should be made to the State Hospital for a period not to exceed 90 days." In his "Report of Examination" submitted with the petition for involuntary commitment, Dr. Kottke

---

5. Section 25–03.1–21(1), NDCC, reads:

"1. Before making its decision in an involuntary treatment hearing, the court shall review a report assessing the availability and appropriateness for the respondent of treatment programs other than hospitalization which has been prepared and submitted by the state hospital or treatment facility. If the court finds that a treatment program other than hospitalization is adequate to meet the respondent's treatment needs and is sufficient to prevent harm or injuries which the individual may inflict upon himself or others, the court shall order the respondent to receive whatever treatment other than hospitalization is appropriate for a period of ninety days."

stated that there are no present treatment alternatives available in lieu of involuntary hospitalization. At the hearing, he testified regarding J.A.D.'s drug therapy program that:

"Q: [W]hen you're increasing the lithium levels, is that something that needs to be checked very regularly?

"A: Right, it would be hard to check in a homeless person that refused any follow-up treatment. It would be hard to get him to take this medication voluntarily out on the streets obviously. Ordinarily, if we have some guy on lithium we like to check him regularly, weekly, probably for the first three or four weeks and then maybe monthly for three or four months to make sure it's stable, make sure the level doesn't get too high ... that requires some kind of follow-up, psychiatric.

"Q: ... [I]n terms of right now, is there any kind of less restrictive alternatives to treatment....

"A: I believe there is, and there could be several actually...."

Dr. Kottke continued by describing a number of treatment alternatives available, but implied that J.A.D. would not follow through with them. Some forms of alternative treatment, however, were not discussed with J.A.D. to determine his receptiveness to it. Most striking about this case is that these less restrictive treatment alternatives have not been attempted. In other cases, we have noted that when other treatment methods like community placement and outpatient treatments have unsuccessfully been utilized, there may be cause for hospitalization. *E.g., Kottke, supra.* These have not been attempted in this case.

There is also reason to give some credence to J.A.D.'s own testimony regarding his treatment. At the hearing, J.A.D. testified that he realizes that he has a problem and that he is trying to "parent himself." He also testified that perhaps being sent to the State Hospital has helped him—in fact, it may have been the best thing for him. The fact that he realizes his problems and to some extent appreciates his recent treat-

ment may instill in him a desire to be treated, thus making less restrictive programs workable. Regardless, J.A.D. was not given a chance at less restrictive alternatives.

Accordingly, we reverse the order for hospitalization and treatment.

LEVINE and MESCHKE, JJ., concur.

ERICKSTAD, Chief Justice, specially concurring.

I respectfully, reluctantly concur in the result of the majority opinion, with great concern that, in our effort to find clear and convincing evidence of J.A.D.'s need for treatment, we have actually tried this case anew and found that evidence wanting.

This we have done, notwithstanding that the majority of this Court has consistently held over the years that the scope of review in our Court, in a case such as this, is to determine whether or not the trial court's findings are clearly erroneous applying Rule 52(a) of the North Dakota Rules of Civil Procedure.

Through our very careful review of the facts and our analysis of the possible consequences of the facts, we may have deprived J.A.D. of treatment crucial to his future welfare, without providing him with a safety net of any kind, at a time, considering the season of the year, when survival as a homeless person in North Dakota could be hazardous to say the very least.

This is the risk we take in favor of liberty when we reverse the findings of a trial court which are based upon professional opinion that we have found unconvincing. We have done this based upon a cold record as distinguished from the trial court's better position of being able to decide after seeing and hearing not only the respondent, but the psychiatrist who examined and gave his medical opinion of the consequences of J.A.D.'s release prior to further treatment. I would have preferred that this matter be remanded for further hearing relative to the issue of possible alterna-

tive treatment rather than a complete reversal.

JOHNSON, J., concurs.