**In the Interest of D.H., Respondent and Appellant.**

Civ. No. 930326.

Supreme Court of North Dakota.

Oct. 26, 1993.

Gregory Ian Runge, Bismarck, for respondent and appellant.

Rick Lee Volk, Asst. State's Atty., Bismarck, for appellee.

VANDE WALLE, Chief Justice.

D.H. appealed from an order finding D.H. to be a person who is mentally ill under section 25–03.1–02(10), NDCC, and a person who requires treatment under section 25–03.1–02(11)(c) & (d), NDCC. The court ordered D.H. to be hospitalized at the North Dakota State Hospital for a period not to exceed ninety days. We reverse.

On August 31, 1993, a preliminary hearing concerning the petition for D.H.'s involuntary treatment was held in accordance with section 25–03.1–17, NDCC. At the preliminary hearing, Burleigh County Court ordered D.H. to temporary treatment at the North Dakota State Hospital for a period not to exceed eight days. On September 8, 1993, the court conducted a treatment hearing wherein the court found D.H. to have exhibited a number of symptoms of what had been diagnosed as schizoaffective schizophrenia. The court listed the symptoms to be as follows: "auditory hallucinations—inappropriate laughter", "difficulty telling what [is] real and what's unreal", "depression—withdrawal", "inability to care for, or make responsible decisions for, self", and "poor judgment, lack of insight into need for treatment."

The court found that D.H. exhibited dangerousness to himself, others, or property by virtue of what the court called a "total lack of insight into need for treatment." Additionally, the court found that a treatment program other than hospitalization was not adequate. The court listed the "specific risks if [D.H.] were not hospitalized" to be "behavior that represents personal risk of safety i.e. walking in traffic" and "significant deterioration in mental status." Based on these findings, the court entered an order requiring that D.H. receive a maximum of ninety days treatment at the North Dakota State Hospital. This expedited appeal followed, wherein D.H. contests the trial court's findings that he is a "mentally ill person" within the meaning of section 25–03.1–02(10), NDCC, and a "person requiring treatment" within the meaning of section 25–03.1–02(11), NDCC.

As a preliminary matter, D.H. urges this court to abandon the clearly erroneous standard of review utilized when we review involuntary treatment orders. *See, e.g., In Interest of J.A.D.,* 492 N.W.2d 82 (N.D.1992); *Kottke v. U.A.M.,* 446 N.W.2d 23 (N.D.1989). D.H. argues that the determination of whether a civil commitment petition is sustained by clear and convincing evidence is a conclusion of law, fully reviewable by this court, *see In Interest of M.H.,* 475 N.W.2d 552, 557 (N.D. 1991) (VandeWalle, J., dissenting), rather than a finding of fact which will not be set

aside unless it is clearly erroneous. *See* Rule 52(a), NDRCivP; *Kottke, supra.* Because the evidence of record in this proceeding is not sufficient to require D.H.'s hospitalization under either view, we need not resolve that issue today.

An order for involuntary treatment may issue only upon clear and convincing proof that the respondent is a "person requiring treatment." NDCC § 25–03.1–19; *J.A.D., supra.* The determination that an individual is a person requiring treatment involves a two-step process; first, the court must find that the individual is mentally ill, and second, the court must find that there is a reasonable expectation that if the person is not hospitalized there exists a serious risk of harm to himself, others, or property. NDCC § 25–03.1–02(11); *J.A.D., supra.*

At the treatment hearing dated September 8, 1993, psychiatrist Dennis Kottke, M.D., testified that he, as well as Dr. S.J. Thakor, diagnosed D.H. as suffering from schizoaffective schizophrenia; D.H. concedes that he may have an organic, mental or emotional disorder. Although D.H. disputes whether the evidence was clear and convincing that the disorder causes him substantial impairment, *see* NDCC § 25–03.1–02(10), the record supports the trial court's conclusion that D.H. is mentally ill.

We conclude, however, that the record does not contain clear and convincing evidence that D.H. is a "person requiring treatment" as defined in section 25–03.1–02(11), NDCC. That section provides,

" 'Person requiring treatment' means a person who is mentally ill or chemically dependent, and there is a reasonable expectation that if the person is not treated there exists a serious risk of harm to that person, others, or property. 'Serious risk of harm' means a substantial likelihood of:

a. Suicide, as manifested by suicidal threats, attempts, or significant depression relevant to suicidal potential;

b. Killing or inflicting serious bodily harm on another person or inflicting significant property damage, as manifested by acts or threats;

c. Substantial deterioration in physical health, or substantial injury, disease, or death, based upon recent poor self-control or judgment in providing one's shelter, nutrition, or personal care; or

d. Substantial deterioration in mental health which would predictably result in dangerousness to that person, others, or property, based upon acts, threats, or patterns in the person's treatment history, current condition, and other relevant factors."

NDCC § 25–03.1–02(11). The trial court concluded that D.H. was a person requiring treatment pursuant to subcategories (c) and (d) of section 25–03.1–02(11), NDCC. We believe the evidence supporting this conclusion is lacking.

Evidentiary matters at involuntary treatment hearings are governed by the North Dakota Rules of Evidence. NDCC § 25–03.1–19. A petitioner for involuntary commitment must present evidence to support the petition; allegations contained in the petition have no per se evidentiary value.

Although it was alleged in the petition for involuntary commitment that D.H. had been "[w]andering, walking down the middle of Expressway Avenue in a 50 mile an hour zone, without median; jumping out in front of cars," no witness testified at the hearing to having observed such behavior.[1] The petition also made reference to D.H. "expressing desire to 'open himself up' with a knife to 'help with his kidneys' which he believes are 'going out'; the word 'castration' was used as well." However, no witness at the hearing was called to support these allegations.[2] Nor was any evidence presented relevant to the recency of the alleged acts. *See* NDCC § 25–03.1–02(11)(c).

Dr. Kottke was the only person to testify at the treatment hearing. Assuming that

---

1. Dr. Kottke, the only witness to testify at the hearing, stated that D.H. "did admit that he had walked down the highway and possibly endangered himself, although he didn't see it as endangering himself."

2. Dr. Kottke testified that D.H. denied having any thoughts of injuring himself.

allegations in commitment petitions are reasonably relied upon by experts in Dr. Kottke's field, he may properly base his opinion on them. Rule 703, NDREv. However, the specific statements contained in the petition alleging unsafe and self-destructive conduct were inadmissible hearsay, and the allegations contained in the statements were not proven through Dr. Kottke's testimony. In the absence of evidence that the underlying allegations are true, the basis for Dr. Kottke's opinion is weak, if not nonexistent, rather than clear and convincing. That Dr. Kottke assumes the allegations to be true is not sufficient.[3] The commitment petition does not serve as proof that D.H. must be committed.[4]

Dr. Kottke admitted that D.H. could be discharged "if we use strictly the criteria" of the statute. We do. We do not doubt that D.H. would and does benefit from treatment. However, "[t]hat is not the statutory standard which authorizes our courts to commit the mentally ill. The standard for involuntary commitment remains clear and convincing proof that the mentally ill individual is a person who *requires* treatment as defined by the statute, not one who would benefit from treatment." *In Interest of R.N.*, 450 N.W.2d 758, 761 (N.D.1990). Because the record contains no clear and convincing evidence that D.H. is a threat to himself, to others, or to property, that standard has not been met.

The county court's order is reversed.

MESCHKE, LEVINE and NEUMANN, JJ., and VERNON R. PEDERSON, Surrogate Judge, concur.

VERNON R. PEDERSON, Surrogate Judge, sitting in place of SANDSTROM, J., disqualified.

3. The following exchange between Dr. Kottke and counsel for D.H. is noteworthy:

> "Q. But if somebody, for example, were walking across Expressway Avenue in a crosswalk, that isn't necessarily dangerous, is it?
> A. I guess it could be, it could not be, depends on the circumstances.
> Q. But you determined that it could be in D.'s case?
> A. I determined that other people who certainly knew him better than I did at that point when I first saw had felt that that had constituted dangerousness to the point that they used that for grounds for transfer for longer term treatment and based on their expertise, I thought I surely should accept that."

4. Although Dr. Kottke denied that his opinion was based solely on the petition, he appears to admit that the fact that D.H. has now been sent to the State Hospital evidences deterioration and the need for a longer evaluation:

> "Q. Doctor, you primarily though base your judgment on the petition, isn't that correct?

> A. No, I don't believe that's correct. I believe the petition is what brought him to my facility and allowed me to see him, gave me the opportunity to evaluate him, which I've done.
> Q. And if the petition is in error, doctor, then there's an error down the line because he was probably faultedly put into the system to begin with—that's a question.
> A. Was that a question?
> Q. Yes.
> A. I disagree and do not believe he was faultedly put into the system. In fact, I think it's quite amazing that in seven years, he's not been in our part of the system prior to this time, which I think speaks to the fact that the community resources have been very well utilized and it's a fact that in spite of those excellent community resources that you have, that he has deteriorated to the point that he is now sent to the facility that I believe we need to take a little bit longer look, get him into a hopefully better placement in the future with some definite, realistic expectation that he will follow through and then hopefully can enhance his chance of success."