**In the Interest of B.D., Respondent and Appellant.**

**Civ. No. 930408.**

Supreme Court of North Dakota.

Jan. 18, 1994.

Gregory Ian Runge, Bismarck, for respondent and appellant.

Bruce B. Haskell, Asst. State's Atty., Bismarck, for appellee.

VANDE WALLE, Chief Justice.

B.D. appealed from the order of the Burleigh County Court requiring that B.D. be hospitalized for a period of ninety days and authorizing treatment of B.D. by forced medication. We affirm and remand with instructions.

B.D.'s aunt initiated a petition for involuntary commitment on December 7, 1993. The petition stated that B.D. was believed to be mentally ill because he had a history of chronic paranoid schizophrenia and severe high blood pressure. The petition alleged that B.D. refused to take medication for these ailments, and that he has exhibited danger to himself by failing to take proper safety precautions when exposed to severe

winter weather conditions. The petitioner also expressed concern that B.D. was a threat to family and others.

The Burleigh County Court held a preliminary hearing on the petition on December 14, 1993. The county court found probable cause that B.D. is mentally ill and requiring treatment and ordered hospitalization at St. Alexius Medical Center in Bismarck, North Dakota, for fourteen days. A treatment hearing was scheduled for December 28, 1993.

Following the treatment hearing, the county court ordered that B.D. be committed to St. Alexius Medical Center for a period of ninety days. The county court also authorized involuntary treatment of B.D. with prescribed medication. On appeal, B.D. challenges the sufficiency of the evidence upon which the county court determined that B.D. is a person requiring treatment. B.D. also challenges the county court's order authorizing forced medical treatment of B.D.

■ Before a court may issue an order for involuntary treatment, the petitioner must prove by clear and convincing evidence that the respondent is a person requiring treatment. NDCC § 25–03.1–19; *In Interest of D.H.*, 507 N.W.2d 314 (N.D.1993). To establish that an individual is a person requiring treatment, petitioner must show that the individual is mentally ill and that there is a reasonable expectation that, if the individual is not hospitalized, there exists a serious risk of harm to the individual, to others, or to property. NDCC § 25–03.1–02(11); *D.H., supra.* Review on appeal is limited to an examination of the procedures, findings, and conclusions of the lower court. NDCC § 25–03.1–29; *In Interest of J.A.D.*, 492 N.W.2d 82 (N.D.1992). The focus of this appeal is whether there was clear and convincing evidence to support the findings of fact by the county court that B.D. was a person requiring treatment, particularly forced medical treatment.

Section 25–03.1–02(10), NDCC, defines "mentally ill person" as "an individual with an organic, mental, or emotional disorder which substantially impairs the capacity to use self-control, judgment, and discretion in the conduct of personal affairs and social relations." Dr. Igmidio Santos, a psychiatrist and the current medical director of West Central Human Service Center, testified that he had examined B.D. and had been treating B.D. at St. Alexius Medical Center for one week prior to the hearing. Dr. Santos, who was the only expert to testify at the hearing, diagnosed B.D. as suffering from "schizophrenia, paranoid type." The testimony of Dr. Santos, which was essentially uncontradicted at the hearing, and which we do not repeat here, shows by clear and convincing evidence that B.D. fits the statutory description of a "mentally ill person".

■ A mentally ill person is not necessarily a "person requiring treatment", however. To establish that B.D. is a person requiring treatment, petitioner was also required to show by clear and convincing evidence that "there is a reasonable expectation that if the person is not treated there exists a serious risk of harm to that person, others, or property." NDCC § 25–03.1–02(11). B.D. argues that the Burleigh County Court erred by concluding the evidence was clear and convincing that, if B.D. were not treated, there was a substantial likelihood that B.D. would kill or inflict serious bodily harm on another, or suffer a substantial deterioration in his physical and mental health. *See* NDCC §§ 25–03.1–02(11)(b), (c), and (d).

Don D., B.D.'s father, testified that B.D. had lived with him in California for all but approximately six months of B.D.'s life. B.D. had been involuntarily hospitalized in California on two occasions. Don D. testified that, prior to the initial hospitalization, B.D. had stopped eating and began living in the canyons of California. After being released from the hospital, B.D. took his prescribed medication for approximately three years. He later stopped taking the medication, however, which led to B.D. being hospitalized a second time. Upon release, medicine was prescribed for B.D., both for mental illness and for hypertension.

In September 1993, B.D. again stopped taking his medication. Dr. Santos testified that, during the time that B.D. has been hospitalized at St. Alexius, he has refused all medication. Although Dr. Santos admitted

that other doctors who had examined B.D. did not view B.D.'s hypertension as posing an immediate danger to B.D., Dr. Santos testified that there was a reasonable expectation that B.D. would be at serious risk of harm to himself if he is not treated, particularly because "he's not eating. He can't take care of himself."

Regarding whether B.D. could pose a threat to others if he is not treated, Don D. testified that B.D. had made an ambiguous threat against him. According to Don D., "He word[ed] it carefully. I would have to say he's warned me that my life is in severe danger by being here, that I should leave immediately. That I can be killed and go to hell real quick. So I take that as a threat." Don D. testified that, on one occasion, B.D. had used physical force against him. Also, in 1982, B.D. had maimed and killed some kittens.

Other threatening behavior was attested to by Dr. Santos: "[T]here was a time when one of the female patients asked to be put in the quiet room. He thinks that the staff is going to do something to her. I think he likes this other female patient. He threatened to hurt the staff. In fact, he made [a] karate stand, ready to strike...." It was also discovered that B.D. had concealed a butter knife in his shoe.

■ We conclude that the Burleigh County Court did not err in its determination that B.D. is a person requiring treatment under the statutory definition in section 25–03.1–02(11), NDCC.

The county court also authorized the involuntary treatment of B.D. with prescribed medication. Dr. Santos requested this authorization under section 25–03.1–18.1, NDCC. He, along with another doctor, whom Dr. Santos identified as Dr. Nguyen, certified: that the proposed prescribed medication is clinically appropriate and necessary to effectively treat B.D.; that there is a reasonable expectation that, if B.D. is not treated as proposed, there is a serious risk of harm to B.D. or to others; that B.D. was offered the treatment and refused it; that the prescribed medication is the least restrictive form of intervention necessary to meet the treatment needs of B.D.; and that the

benefits of the treatment outweigh the known risks to B.D. NDCC § 25–03.1–18.-1(1).

Before a court may authorize involuntary treatment, subsection (3) of section 25–03.1–18.1, NDCC, requires that each of the factors certified to by Dr. Santos and Dr. Nguyen be proved by clear and convincing evidence. The court may consider evidence including:

"(1) The danger the patient presents to self or others;

(2) The patient's current condition;

(3) The patient's past treatment history;

(4) The results of previous medication trials;

(5) The efficacy of current or past treatment modalities concerning the patient;

(6) The patient's prognosis; and

(7) The effect of the patient's mental condition on the patient's capacity to consent."

NDCC § 25–03.1–18.1(2)(a).

■ B.D. argues that the request for authorization for involuntary treatment was flawed because Dr. Nguyen's signature on the request was difficult to read and Dr. Santos, rather than Dr. Nguyen himself, testified that Dr. Nguyen had signed the request. B.D. contends that there was no foundation laid by Dr. Santos regarding his familiarity with Dr. Nguyen's signature. B.D. objected on hearsay grounds when Dr. Santos was asked whether Dr. Nguyen concurred in his opinion that B.D. requires treatment. However, B.D. did not earlier object to the testimony of Dr. Santos that it was Dr. Nguyen who had signed the request; we will not consider issues raised for the first time on appeal. *E.g. Thomas v. Stickland,* 500 N.W.2d 598 (N.D.1993).

■ B.D. also argues that Dr. Nguyen should have been required to testify at the hearing. We might agree that something more than a signature would be appropriate to fully convince the court that the doctor concurs in Dr. Santos's opinion that B.D. is in need of forced medication, but the statute does not specifically require that both doc-

tors testify at the treatment hearing. Furthermore, the statute requires that the second physician not be "involved in the current diagnosis or treatment of the patient." Although the procedure necessary for the second physician to certify the medication is appropriate and necessary and yet not be "involved in the current diagnosis or treatment" is ambiguous at best, we conclude that the county court did not err in determining that the request for authorization for involuntary treatment satisfied the statutory requirements.

B.D. also contests the county court's findings regarding whether each of the factors certified to by Dr. Santos and Dr. Nguyen, and enumerated in section 25–03.1–18.1(1)(a), NDCC, were proved by clear and convincing evidence.

As discussed earlier, we find no error in the county court's determination that the evidence was clear and convincing that there is a reasonable expectation that B.D. poses a risk of serious harm to himself or to others if he does not receive the medical treatment. NDCC § 25–03.1–18.1(1)(a)(1). Also, B.D. concedes that he was offered treatment and has refused it. NDCC § 25–03.1–18.1(1)(a)(2).

■ B.D. does assert, however, that the evidence was insufficient to find that forced medication is the least restrictive form of intervention necessary to meet the treatment needs of B.D. NDCC § 25–03.1–18.1(1)(a)(3). B.D. argues that the least restrictive form of intervention is that intervention which he wants; that he does not want the prescribed medication which would be injected into his body, and therefore it is not the least restrictive form of intervention under the statute. We decline to·adopt such a subjective definition of the term "least restrictive" form of intervention. Rather, under circumstances where a respondent's judgment might well be impaired, we believe a more objective standard is appropriate. *See Washington v. Harper*, 494 U.S. 210, 110 S.Ct. 1028, 108 L.Ed.2d 178 (1990) [concluding that Due Process Clause was not violated when mentally ill prisoner, who had not been adjudged legally insane or incompetent, received antipsychotic drugs by injection against his wishes].

■ Dr. Santos testified that after the condition of a patient is stabilized through medication, the patient will be seen on an out-patient basis: "After they are stabilized in the beginning, they should be seen like every week or every two weeks, and then every one month and then extended when they are doing good and no side effects.... If [B.D.] responds well after two weeks or three weeks, then he's stabilized, and he might be discharged in about a month, or less than a month." Dr. Santos testified that improvement by B.D. may be impossible without medication; rather, B.D. will deteriorate mentally without medication. This testimony is supported by the testimony of Don D., who testified that B.D. had deteriorated on those occasions in the past when B.D. disregarded his medication. No other expert challenged Dr. Santos's testimony in this regard.

We emphasize that the statute calls for the "least restrictive form of intervention", not the least intrusive form of intervention. While the involuntary injection of psychotropic medication may be more intrusive to the individual than treatments not involving injections, the testimony of Dr. Santos clearly and convincingly establishes that no other form of treatment will meet the treatment needs of B.D. When the decision is whether to medicate B.D. by forced injections, which may lead to his release from the hospital in less than a month, or to have B.D. continue to deteriorate and remain hospitalized indefinitely because he refuses to take medication, we conclude that forced medication is the least restrictive form of treatment for B.D.'s needs.

■ We also conclude that the county court did not err in determining that the evidence was clear and convincing that the benefits of forced medication outweigh the risks of the medication to B.D. NDCC § 25–03.1–18.1(1)(a)(4). Dr. Santos admitted that the medications that have been prescribed, namely Haldol and Prolixin, carry a possibility of adverse side effects. However, except for evidence of stiffness, there was no evidence that B.D. had suffered these ill effects

when taking the medications in the past. Further, Dr. Santos testified that the close monitoring of B.D. which the hospital would afford him would ensure that any side effects would be minimized.

█ Finally, B.D. argues that the prescribed medication has been authorized solely for the convenience of the hospital staff, in violation of section 25–03.1–18.1(2)(b), NDCC. The evidence does not support this contention. It is anticipated that the medication will improve B.D.'s mental condition. Although the result may be that the medication will minimize the potential threat that B.D. poses to members of the hospital staff based on his illness, no evidence demonstrates that the medication was prescribed solely for the convenience of the staff. The testimony of Dr. Santos and of Don D. reveals that B.D. is in need of treatment through medication; the medication was prescribed for that purpose.

We note, however, that neither the request for authorization to treat, nor the order authorizing treatment specify the medications to be administered. At the treatment hearing, Dr. Santos testified that the prescribed medications were Haldol and Prolixin. Respondents must be afforded adequate notice to prepare for treatment hearings. *State v. Nording*, 485 N.W.2d 781 (N.D.1992). B.D. has not raised inadequate notice as an issue on appeal; the admirable performance of B.D.'s counsel on cross-examination of Dr. Santos at the hearing indicates that B.D. was well aware that Haldol and Prolixin were to be the medications at issue at the hearing.

█ We believe the preferable practice is to specify the prescribed medication in the request for authorization for treatment. Further, we read the statute as requiring the court order to specify the medications, at least by generic name, the court authorizes to be involuntarily administered. We therefore remand for a modification of the county court order, in accordance with the evidence adduced at the hearing.

█ The order of the county court is affirmed; the temporary stay pending appeal granted by this court is lifted January 21, 1994, absent further order of the court, and the mandate will be issued on that date.[1]

MESCHKE, LEVINE and NEUMANN, JJ., and RALPH J. ERICKSTAD, Surrogate Judge, concur.

ERICKSTAD, RALPH J., Surrogate Judge, sitting in place of SANDSTROM, DALE V., Justice, disqualified.

1. The county court issued a 24 hour stay in order to permit B.D. to appeal to this court. B.D. contends the provision in section 25–03.1–29, NDCC, that pending appeal "the order appealed from shall remain in effect, unless the supreme court determines otherwise" means that the trial court is without authority to issue a stay; that if the respondent desires a stay it must be granted by this court after a notice of appeal; and that the respondents right to appeal within 30 days, also contained in section 25–03.1–29, NDCC, is thereby restricted to an immediate appeal. The respondent contends the matter is further complicated by Rule 2.1(d), N.D.R.App.P., which requires the brief to be filed with the notice of appeal in order to expedite the requirement of section 25–03.1–29, NDCC, that the appeal be heard within 14 days of the filing of the notice of appeal. We did waive the filing of the brief with the notice of appeal in this instance but refused to extend the time for hearing beyond 14 days.

The order from which the appeal was taken contained a stay of the order for forced medication. By its terms, therefore, the order, including the stay, remained in effect on appeal. Respondent's argument appears to be with the length of the stay rather than the authority of the trial court to issue the stay. We do not construe the wording of section 25–03.1–29, NDCC, to limit the authority of the trial court to grant a stay under Rule 8(a), N.D.R.App.P. *See* Rule 2.1(g), N.D.R.App.P. [rules of appellate procedure apply to extent not inconsistent with section 25–03.1–29, NDCC, or Rule 2.1, N.D.R.App.P.].

Finally, we note that the statute only refers to an order remaining in effect "pending an appeal." Where no appeal is taken there should be no argument that the trial court is the appropriate court to order a stay in the first instance. If, of course, a stay is denied, Rule 8, N.D.R.App.P., permits an application for a stay to the Supreme Court.